[No. S055474. Apr. 24, 2006.]

THE PEOPLE, Plaintiff and Respondent, v.
CLIFTON PERRY, Defendant and Appellant.

COUNSEL

Michael J. Hersek, State Public Defender, under appointment by the Supreme Court, Alison Pease and Ronald F. Turner, Deputy State Public Defenders, for Defendant and Appellant.

Bill Lockyer, Attorney General, Robert R. Anderson, Chief Assistant Attorney General, Mary Jo Graves, Assistant Attorney General, Patrick J. Whalen and John G. McLean, Deputy Attorneys General, for Plaintiff and Respondent.

OPINION

KENNARD, J.—In May 1996, a jury found defendant Clifton Perry and codefendant Leon Noble guilty of the murder (Pen. Code, § 187)[1] and second degree robbery (§§ 211, 212.5, subd. (c)) of Saeed Nasser. The jury also found that defendant, but not Noble, personally used a firearm during the commission of the crimes. It further found, as a special circumstance, that the murder occurred during the commission of a robbery (§ 190.2, subd. (a)(17)). After a penalty trial, the jury returned a verdict of death for defendant, and life imprisonment without the possibility of parole for Noble.[2]

The trial court denied defendant's motion for modification of the verdict, and it sentenced defendant to death for the murder of Saeed Nasser. On the robbery conviction, the trial court sentenced defendant to the upper term of five years' imprisonment, with a consecutive five-year term for the personal use of a firearm.

Defendant's appeal to this court is automatic. (§ 1239, subd. (b).) We affirm the judgment and penalty.

## I. FACTS AND PROCEEDINGS

### A. Guilt Phase Evidence

#### 1. Events preceding the crime

About noon on July 9, 1995, defendant and Paul LeBlanc arrived at the home of Elisa Padilla. They joined Padilla, Shaundra Stephens, and Henry Pridgett in drinking alcohol and smoking marijuana. Later that afternoon

---

[1] All statutory references are to the Penal Code unless otherwise noted.

[2] Noble's convictions were affirmed by the Court of Appeal in an unpublished opinion.

codefendant Noble paged defendant, after which defendant and LeBlanc picked up Noble at his stepmother's house. When they returned to Padilla's house, Noble asked defendant if he wanted to get some money; defendant said he was "down" for that. Pridgett overheard defendant, Noble, and LeBlanc discussing a store robbery, and heard LeBlanc say, "don't do that." Defendant asked Stephens to buy some gloves and red bandanas. She did so.

Noble suggested that they use his stepmother's car for the crime. Defendant and Noble left in defendant's car but returned in the stepmother's car. Defendant then asked LeBlanc, who had defendant's gun, to return it to him. LeBlanc gave defendant the gun, which was loaded and wrapped in a white sock.

### 2. *The robbery and murder of Saeed Nasser*

About 9:30 p.m. on July 9, 1995, 16-year-old Sami Nasser was working at the cash register of the Stop and Shop Market in Hanford in Kings County. Sami's uncle Abdul Nasser and two customers, Alfonso Garcia and William Jones, were also in the store. Sami's other uncle, 47-year-old Saeed Nasser, the store's owner, was in a back room.

Sami saw a man run into the store, climb over the counter, and demand money. The man wore a bandana, concealing his face; Sami thought the man was Black from the way he spoke. The man struck Sami with what Sami thought was a gun. Sami was not seriously injured, but he dropped to the floor behind the counter to avoid further injury. As he fell behind the counter, Sami heard two gunshots. He began crawling toward the door to the back room. He heard several more shots, and his Uncle Saeed said "oh, no" or something like that. When Sami looked out from behind the counter, he saw Saeed lying wounded on the floor. Sami called the police from a telephone behind the store and asked for an ambulance. When he returned to the front room, everyone was gone except Saeed.

The two customers, Jones and Garcia, testified that two Black men entered the store and demanded money. Their faces were covered with bandanas. Garcia said the man at the cash register hit Sami with a gun, and then fired two shots. As Garcia ran from the store, he heard four or five more shots.

According to Jones, the man at the cash register hit Sami with his hand, not a gun; the other man had a gun wrapped in a white cloth. Jones saw Saeed grab one of the men and strike him. As Jones fled to the back room with Abdul Nasser, he heard two gunshots, then three more.[3]

---

[3] Abdul Nasser returned to Yemen before the trial and did not testify.

Beatrice Cruz, who lived across the street from the Stop and Shop Market, heard gunshots. She saw two Black men run out of the store and around a corner. The taller of the two men had his hair in french braids. A car took off, going away from the market. After asking someone in her house to call the police, Cruz went to the store. She entered the store just before the police arrived, and saw Saeed Nasser lying wounded on the floor.

Saeed Nasser had three bullet wounds in the abdomen. He died from loss of blood a few hours after the shooting. The police discovered fragments of five bullets in the store; a sixth bullet was lodged in Saeed's body.

### 3. *Events after the crime*

When defendant and Noble returned to Padilla's house, defendant told Henry Pridgett "I just got my blast on," meaning that he had shot somebody. He took off a red bandana and asked Pridgett to burn it. After doing so, Pridgett saw defendant and Noble counting money.

Defendant told Paul LeBlanc that someone "had tried to rush him" and that defendant then "shot him." He asked LeBlanc to dispose of some empty gun shells. Later, defendant turned on the television news and saw a description of the Stop and Shop Market robbery that identified the suspects as two Hispanic males. According to Pridgett, after hearing this, Noble and defendant shook hands and were saying, "Yeah, that was smooth."

On July 15, 1995, police searched behind Padilla's home and found burned clothing, including gloves and a red bandana, on top of a woodpile. Under the wood they found a .357-caliber Ruger revolver, wrapped in a shirt. The bullets recovered from the robbery matched bullets test fired from the revolver.

### 4. *Defendant's guilt phase evidence*

Noting the testimony of Beatrice Cruz that one robber had his hair in french braids, defendant called Rubi White, a cosmetologist, to testify that neither defendant nor Noble had hair long enough to braid. The prosecutor showed White a picture of defendant taken shortly after the murder. She said defendant's hair was longer then but still too short to braid.

### B.  *Penalty Phase Evidence*[4]

#### 1.  *Prosecution evidence*

Sami Nasser testified that victim Saeed had a wife and six children in Yemen. He sent them several thousand dollars every two or three months. Saeed had been in the United States about 29 years and was planning to apply for citizenship.

The prosecution played the tape of a statement defendant gave the police. In that statement, defendant said he had been in Saeed's store 100 to 200 times, and considered Sami a friend. He said Saeed was a nice guy who "looked after" defendant and would cash defendant's checks even when defendant had no identification with him.

The parties stipulated as follows: On October 22, 1985, defendant was found in juvenile court to have committed two counts of assault with a deadly weapon; on March 7, 1986, he was found in juvenile court to have committed attempted robbery and assault with a deadly weapon; on October 17, 1989, he was convicted of battery; and on June 6, 1990, he was convicted of robbery with the use of a firearm.

#### 2.  *Defendant's evidence*

Defendant's wife, Ernestine Perry, testified that during their three-year marriage defendant had never physically abused her. Miguel Herrera, Ernestine's father, testified that defendant had worked for him in his dairy construction businesses, and was a good and responsible employee.

Richard Dubois, a retired California Youth Authority counselor, considered defendant "way above the norm in terms of his willingness to cooperate and his ability to do what was asked of him." Dubois said defendant would not be a threat to other inmates or staff in an institutional setting.

Defendant testified on his own behalf at the penalty trial and described the robbery and murder. He said that he decided to commit a robbery because he needed money. He was armed with a gun he got from LeBlanc. Codefendant Noble did not have a gun.

Defendant wore a baseball cap and a red bandana during the robbery. He saw Noble use his right hand to hit Sami, who fell to the floor. When

---

[4] We omit discussion of the penalty phase evidence that is related solely to codefendant Noble, who was sentenced to life imprisonment without the possibility of parole.

someone came up behind defendant and tried to grab him, defendant spun in a circle and started shooting.

Defendant then described his childhood and adolescence. During defendant's childhood, his father was in prison. The department of social services regularly took defendant from his mother, a heroin user, because she beat him, but later returned him to her custody.

When defendant was nine or 10 years old, the family moved to South Central Los Angeles. Defendant joined a gang called the 59 East Side Crips for protection against being beaten by older boys.

Defendant spent most of his adolescence at the California Youth Authority, where he attended school. After he was paroled, he entered Fresno City College. While in Fresno, defendant performed cardiopulmonary resuscitation on a child drowning victim, and he received a letter of appreciation from the emergency medical services. About two weeks later, however, defendant committed an armed robbery; he received a 26-month sentence, which he served at Soledad State Prison. Defendant explained he had a gun for protection because he had been shot twice. He thought he was shot at frequently because he had a reputation for never backing down.

## II.  GUILT PHASE ISSUES

### A.  *Defendant's Absence from the Trial Court's Conference on the Exclusion of Spectators*

#### 1.  *The bench conference on the exclusion of spectators at the trial*

On May 9, 1996, during the guilt phase of defendant's capital trial, the bailiff told the trial court that two jurors (Juror No. 7 and Alternate Juror No. 6) mentioned that the previous afternoon they had overheard a conversation between two spectators discussing the testimony at the trial. The court informed counsel and defendants. It then questioned the two jurors outside the presence of the other jurors.

Juror No. 7 said that the two spectators discussed whether witness Henry Pridgett said that about 30 joints had been smoked on the day of the murder. While Juror No. 7 was describing what he had heard, Ernestine Perry, defendant's wife, entered the courtroom and exclaimed: "Bailiff, Paul [LeBlanc] and his mother are attacking me. They're out there attacking me." The judge went off the record. When he went back on the record, he asked Juror No. 7

to complete his description of the two spectators; the juror responded that they were "very nice looking, well-dressed Black women." The juror agreed to disregard anything he had heard and decide the case strictly on the evidence.

Alternate Juror No. 6 also described the conversation between the two spectators: "[T]he gist . . . was that an individual that testified yesterday had lied and that anybody else that took the stand was going to lie and a name that was mentioned was Paul. And then just after that it was they don't know that 30 joints were smoked there that day." Alternate Juror No. 6 agreed that she would make her decision solely on the basis of sworn testimony.

The trial court then stated that it was "going to have to initiate some additional procedures to try to make sure that the jurors are completely isolated from any spectators or witnesses." It called for a bench conference with the prosecutor, defendant's counsel, and codefendant Noble's counsel. Defendant and Noble were not present at the conference.

At the bench conference, defendant's attorney said that "after today's testimony [from Paul LeBlanc and Shaundra Stephens], I can fairly assure the court that things are going to heat up as far as outside the courtroom."

After a recess, the trial judge resumed the bench conference. The prosecutor and counsel for both defendants were present, as well as Ernestine Perry (defendant's wife) and Christina Herrera (Ernestine's sister). Defendant and codefendant Noble were not present.

Ernestine Perry said she just wanted to be in the courtroom for her husband, but that court personnel would not let her in. She claimed that she had been attacked by Paul LeBlanc and his mother. They had threatened her before, and she had made complaints about them to the police.

The trial judge told Ernestine Perry: "Your presence in the courthouse or in the courtroom is going to create a potentially disturbing element here and we can't have that." Anticipating that the judge was going to exclude her, defense counsel said: "[T]o make a long story short, this is not my first exposure to Mr. Perry, and I can assure you that if his wife is excluded at this trial, it's going to take a difficult turn. He will go off. He will be unmanageable. He will hurt somebody, and I might be the person."

Counsel for codefendant Noble suggested: "I think that maybe having Miss Herrera [Ernestine Perry's sister] here will appease Mr. Perry in that she at

least can communicate—because I'm assuming what's happening is she's communicating with Ernestine Perry as to what's going on, and that's substituting [for] her appearances here in court. If you exclude Miss Herrera, Ernestine is not going to have any information. So having her here, and she hasn't caused any problems, may solve the problem." Defendant Perry's counsel added: "The biggest part of our job right now is trying to keep these two gentlemen gentlemen, it's not easy. I'm just afraid if the information gets back that Miss Herrera has been excluded from the courtroom too, my client's going to be—we have seven or eight more days of trial, this is going to turn into a month."

The trial court then ruled that Christina Herrera, but not Ernestine Perry, could remain in the courtroom as long as she did not disrupt the proceedings.

Based on this incident, defendant contends that the bench conference was a critical stage of the trial from which he was improperly excluded. He also argues that at the bench conference his counsel acted contrary to defendant's interests and, in effect, abandoned him.

### 2. *Defendant's right to be present at the bench conference*

Defendant contends that his absence from the bench conference when his counsel expressed concern about excluding defendant's wife from the courtroom deprived him of his right to be present under the Sixth and Fourteenth Amendments to the United States Constitution, as well as under article I, section 15 of the California Constitution, and Penal Code section 1043. We disagree.

In *People v. Bradford* (1997) 15 Cal.4th 1229 [65 Cal.Rptr.2d 145, 939 P.2d 259], we stated: "[A] defendant has a federal constitutional right, emanating from the confrontation clause of the Sixth Amendment and the due process clause of the Fourteenth Amendment, to be present at any stage of the criminal proceedings 'that is critical to its outcome if his presence would contribute to the fairness of the procedure.' [Citations.] In addition, a defendant has the right to be personally present at critical proceedings, pursuant to the state Constitution [citations], as well as pursuant to statute [citations]." (*Id.* at pp. 1356–1357; see *Kentucky v. Stincer* (1987) 482 U.S. 730, 745 [96 L.Ed.2d 631, 107 S.Ct. 2658]; *People v. Davis* (2005) 36 Cal.4th 510, 530 [31 Cal.Rptr.3d 96, 115 P.3d 417]; *People v. Roldan* (2005) 35 Cal.4th 646, 717–718 [27 Cal.Rptr.3d 360, 110 P.3d 289]; *People v. Waidla* (2000) 22 Cal.4th 690, 741 [94 Cal.Rptr.2d 396, 996 P.2d 46].) "An appellate court applies the independent or de novo standard of review to a trial court's exclusion of a criminal defendant from trial, either in whole or in part, insofar as the trial court's decision entails a measurement of the facts against the law."

(*People v. Waidla, supra,* 22 Cal.4th at p. 741.) Erroneous exclusion of the defendant is not structural error that is reversible per se, but trial error that is reversible only if the defendant proves prejudice. (*Rushen v. Spain* (1983) 464 U.S. 114, 118–119 [78 L.Ed.2d 267, 104 S.Ct. 453]; *People v. Bradford, supra,* 15 Cal.4th at p. 1357.)

Under the decisions cited above, a defendant's right to be present depends on two conditions: (1) the proceeding is critical to the outcome of the case, and (2) the defendant's presence would contribute to the fairness of the proceeding. (See *Kentucky v. Stincer, supra,* 482 U.S. 730, 745; *People v. Bradford, supra,* 15 Cal.4th 1229, 1356–1357.) Thus a defendant may ordinarily be excluded from conferences on questions of law, even if those questions are critical to the outcome of the case, because the defendant's presence would not contribute to the fairness of the proceeding. Examples include the exclusion of a defendant from a conference on the competency of child witnesses (*Kentucky v. Stincer, supra,* 482 U.S. 730), a conference on whether to remove a juror (*Rushen v. Spain, supra,* 464 U.S. 114), and a conference on jury instructions (*People v. Morris* (1991) 53 Cal.3d 152, 210 [279 Cal.Rptr. 720, 807 P.2d 949]). And there is no error in excluding a defendant from routine procedural discussions on matters that do not affect the outcome of the trial, such as when to resume proceedings after a recess. (See, e.g., *People v. Hines* (1997) 15 Cal.4th 997, 1039–1040 [64 Cal.Rptr.2d 594, 938 P.2d 388].)

Defendant does not argue that a hearing to determine who will be allowed to sit as spectators at the trial is necessarily a critical stage of the trial, or that defendant would necessarily have anything to contribute at such a hearing. Instead, he contends that when his counsel said that defendant might become violent and unmanageable if defendant's wife were barred from attending the trial, counsel *transformed* the bench conference into one at which defendant was entitled to be present.[5]

Defendant relies on two federal appellate court decisions by the Ninth Circuit that were later vacated by the granting of rehearings en banc. In *Campbell v. Rice* (9th Cir. 2002) 302 F.3d 892, the trial court excluded the defendant from a chambers conference called to determine whether the

---

[5] Defendant also argues that the earlier hearing at which he was present, when the court first inquired into whether jurors had overheard the two court spectators' comments, was a critical stage of the trial because it affected what evidence was heard by the jury. Defendant then maintains that the bench hearing from which he was excluded was a critical stage of the trial because it was a continuation of the earlier hearing. But the record does not support this contention. The transcript of the hearing from which defendant was excluded shows that the court considered only the question of which persons should be barred from the courtroom, and not whether any juror or alternate juror received information about the case from the spectators.

defense counsel had a conflict of interest because he had been arraigned on a charge of possession of methamphetamine.

The federal court of appeals held that Campbell had been denied due process because his presence at the hearing " 'would [have] contribute[d] to the fairness of the procedure.' " (*Campbell v. Rice, supra*, 302 F.3d at p. 899.) Campbell could have asked questions to explore more fully the nature of the alleged conflict, and stated his own views on whether to object to his attorney's possible conflict of interest or whether to waive that conflict. (*Ibid.*) Campbell would also have learned a fact—that his counsel had been charged with a felony—of which he was otherwise unaware, and which might have led him to request new counsel.

The decision on which defendant relies, however, was vacated when the Ninth Circuit granted a rehearing en banc. (*Campbell v. Rice* (2004) 386 F.3d 1258.) On rehearing, the federal appellate court did not decide whether the trial court erred in excluding the defendant from the conference, because it concluded that any error would be harmless. (*Campbell v. Rice* (9th Cir. 2005) 408 F.3d 1166, 1172 (en banc).) Thus *Campbell v. Rice, supra*, 302 F.3d 892, is no longer precedent and does not support defendant's position.

Defendant also cited *Bradley v. Henry* (9th Cir. 2005) 428 F.3d 811, in which the defendant was excluded from an in camera hearing to determine whether her attorneys, retained by her father, should be allowed to withdraw because the father had not paid them. The federal court of appeals held that the hearing was a critical stage of the trial because it would determine who represented the defendant at the trial, and that her exclusion was reversible error. (*Id.* at p. 820.) Thereafter, the Ninth Circuit granted a rehearing en banc (*Bradley v. Henry* (9th Cir. 2005) 432 F.3d 938.), thus vacating the earlier decision.

Finally, defendant relies on *King v. Superior Court* (2003) 107 Cal.App.4th 929 [132 Cal.Rptr.2d 585], which held that the exclusion of a defendant from a hearing to determine whether the defendant's misconduct forfeited his right to counsel denied the defendant due process of law. (*Id.* at p. 950.)

■ We do not dispute that a defendant may be entitled to be present at a conference called to consider whether to remove his counsel for conflict of interest or any other reason, because the removal of counsel will affect the defendant's representation at trial, and is a matter on which the defendant's views should be heard. (See *State v. Lopez* (2004) 271 Conn. 724 [859 A.2d 898].) Here, however, the bench conference was not called to consider such a crucial matter, but only to determine whether certain spectators should

be excluded from the courtroom—a routine procedural matter for which the defendant's attendance is not required. The comments of defense counsel were appropriate to that issue.

Defendant insists the hearing was critical because, he asserts, both the prosecutor and the trial court thereafter viewed defendant as a violent person. He points out that the prosecutor cross-examined defendant about defendant's violent conduct, and that the trial court referred to defendant as a violent person in denying the motion to modify the verdict of death, and later at the sentencing hearing. But by the time of the prosecutor's cross-examination of defendant and the court's comments about defendant's violence, both the prosecutor and the court had heard substantial, uncontroverted evidence of defendant's violent nature. Defendant had testified on direct examination at the penalty trial, admitting the charged robbery, impliedly admitting the murder, and describing himself as a gang member since the age of 10 who carried a gun to intimidate people and never backed down. The parties had stipulated that defendant had previously twice been found to have committed assault with a deadly weapon, had been convicted of battery, and had been convicted of robbery with the use of a firearm. Thus, when the prosecutor and the trial court described defendant as a violent man, they did not need to rely on the comments of defense counsel at the bench conference, and in fact did not refer to those comments.

Defendant further argues that if he had been present at the bench conference and heard that his attorney considered him to be a violent person and was afraid of him, he might have claimed that an irreconcilable conflict existed between him and his attorney requiring appointment of new counsel. (See *People v. Fierro* (1991) 1 Cal.4th 173, 204 [3 Cal.Rptr.2d 426, 821 P.2d 1302].) But as we have explained, a defendant has a right to be present at a proceeding only if the proceeding is critical to the outcome of the case and the defendant's presence would contribute to the fairness of the proceeding; he has no right to be present a routine procedural discussions that could not affect the outcome of the trial. (*Ante*, at p. 312.) Defendant's argument is inconsistent with these settled principles, because it implies that a defendant has the right to be present at any proceeding in which his attorney might say something that could lead the defendant to request new counsel, even if, as here, the proceeding involves a routine procedural matter not critical to the outcome of the case.

Furthermore, if defendant had sought new counsel based on what his counsel said at the bench conference, the trial court would have had no basis to grant the motion. There is no showing on the record here that defendant's counsel was providing ineffective representation, that there was any conflict between client and counsel concerning the defense of the case, that counsel's

fear of his client was hampering the defense, or that any replacement counsel would not also view defendant as dangerous.

Finally, defendant asserts that his counsel's view of him as a dangerous and threatening person led counsel to present an inadequate penalty phase defense. But defendant acknowledged at oral argument that this contention cannot be raised on appeal, but only by petition for habeas corpus.

### 3. *Defendant's claim that his counsel abandoned him*

Defendant contends that defense counsel violated his duty of loyalty to his client and, in effect, abandoned his client. Defendant relies on *King v. Superior Court, supra,* 107 Cal.App.4th 929. There, at a hearing on whether the defendant through misbehavior had forfeited his right to counsel, defense counsel offered no argument in support of his client's right to counsel, but instead presented evidence of additional violent conduct. (*Id.* at p. 950.) The Court of Appeal concluded that because counsel was advocating against his client, the latter was in effect unrepresented at the forfeiture hearing and thus deprived of his right to counsel and to due process of law. (*Ibid.*; see *Rickman v. Bell* (6th Cir. 1997) 131 F.3d 1150, 1157 [counsel "combined a total failure to actively advocate his client's cause with repeated expressions of contempt for his client"].)

This case is quite different. Defendant's counsel represented defendant's interests at the bench conference held to determine whether defendant's family should be barred from the courtroom. Although the trial court was considering banning all members of defendant's family from attending the trial, defendant's counsel and counsel for codefendant Noble persuaded the court to permit Christina Herrera, the sister of defendant's wife, to attend the trial. It is true that describing a client as a violent person ordinarily would not be in the client's interest, but here defense counsel, by suggesting the problems that might arise from the trial court's initial suggestion to exclude all family members, served his client's interest.

Defendant's counsel also was trying to forestall a possible violent outburst by defendant, which would *not* have been in defendant's interests. It could have resulted in defendant's being shackled or otherwise restrained during the trial, which would have left harmful impressions on the judge and jury. Defense counsel's explanation of defendant's dangerousness to the trial judge, made outside the presence of the jury, avoided the far greater risk that defendant might became violent during the trial. In sum, defense counsel neither violated a duty of loyalty to his client nor abandoned his client, but acted in defendant's best interest.

Defendant contends that defense counsel revealed privileged information in discussing defendant's violent character. But counsel's comments at

the bench conference about the risk that defendant would become violent were based on counsel's past experience with defendant. They did not reveal any confidential communications with his client, and thus did not violate the attorney-client privilege. (See Evid. Code, § 952.) An attorney's impression of his client's mental state is not protected by the attorney-client privilege. (See *Darrow v. Gunn* (9th Cir. 1979) 594 F.2d 767, 774; 2 Witkin, Cal. Evidence (4th ed. 2000) Witnesses, § 109, pp. 365–367.)

### B. Issues Relating to Exhibit No. 44, a Photograph of the Murder Victim

People's exhibit No. 44 was a photograph of Saeed Nasser, the murder victim, as he lay wounded on the floor of the Stop and Shop Market. Three witnesses—Sami Nasser, Beatrice Cruz, and Willie Jones—testified that the photograph showed what the victim looked like after he was shot. At the close of the prosecution's case, the prosecutor moved to have all prosecution exhibits, including No. 44, admitted into evidence. The trial court overruled defendants' objections and admitted the exhibit.

During the preparation of the record on appeal, appellate counsel notified the superior court clerk that he had not received a copy of exhibit No. 44. The clerk was unable to locate the exhibit.

After a hearing, the trial court issued a settled statement concerning exhibit No. 44. According to the settled statement, the prosecution furnished the attorneys for defendant and codefendant Noble a set of nine photographs, all showing the murder victim lying on the floor of the market. Defendant's trial counsel thought that one of the photographs was exhibit No. 44, but did not recall which one it was. The prosecutor's file contained eight photographs, all except the one labeled photo No. 5. The prosecutor had no independent recall of which photograph became exhibit No. 44, but speculated that photo No. 5 was removed from the file to be introduced into evidence as exhibit No. 44. The trial judge in the settled statement said there was a high probability that photo No. 5 was exhibit No. 44.

Defendant argues that the trial court committed prejudicial error in admitting exhibit No. 44, asserting that the exhibit was irrelevant, more prejudicial than probative, and that its admission denied him due process of law under the federal and state Constitutions. He further contends that because exhibit No. 44 is missing, this court is unable to review his claim that the admission of exhibit No. 44 was prejudicial error, and thus has no choice but to reverse defendant's convictions for robbery and murder.

### 1. *Adequacy of the appellate record*

In *People v. Osband* (1996) 13 Cal.4th 622 [55 Cal.Rptr.2d 26, 919 P.2d 640], this court faced a problem with the appellate record far more serious than is presented by this appeal. In *Osband,* misconduct in the office of the superior court clerk had resulted in the destruction of 80 exhibits. The trial court was able to reconstruct 62. For another 12, all photographs, the court could identify between two and five photographs that might have been the missing exhibits. Six exhibits could not be reconstructed. (*Id.* at p. 662.) We nevertheless concluded: "[A]lthough the record as reconstructed remains deficient, defendant has not met his burden of showing that the deficiencies . . . have left him unable to proceed with his appeal on a record adequate to permit meaningful appellate review." (*Id.* at p. 663.)

Here only one exhibit is missing, and that exhibit, like the 12 photographs in *Osband,* is probably one of a group of photographs that are available. We know from the testimony of three witnesses that missing exhibit No. 44 was a photograph of the murder victim as he lay wounded on the floor of the store. It is highly probable that it is one of the nine photographs attached as an exhibit to the settled statement; all nine depict the victim lying on the floor after he had been shot, and there is no evidence that any other photographs of the victim were taken at the time. It is likely that the reason the prosecutor did not have photo No. 5, but defense counsel did, is that the prosecutor removed it from his file to offer it into evidence as exhibit No. 44. But it is unnecessary to determine for certain if exhibit No. 44 was photo No. 5, because all nine of the photographs depict virtually the same scene, with only differences in camera angle. We can therefore review defendant's contention that the admission of exhibit No. 44 was prejudicial error on the basis that the exhibit was a photograph of the murder victim identical or very similar to photo No. 5.

### 2. *Admissibility of exhibit No. 44*

Defendant contends that exhibit No. 44 should have been excluded because it was irrelevant (see Evid. Code, § 350), and because it was more prejudicial than probative (see Evid. Code, § 352). He argues that its admission denied him due process of law under the Fifth, Sixth, Eighth, and Fourteenth Amendments to the United States Constitution, as well as sections 7, 15, 17, and 24 of article I of the California Constitution.[6]

Exhibit No. 44, however, was unquestionably relevant because it showed the murder victim lying wounded at the scene of the crime shortly

---

[6] Defendant did not raise constitutional objections to the admission of exhibit No. 44 in the trial court, but his objection that the admission of exhibit No. 44 would violate section 352 of the Evidence Code because the evidence was more prejudicial than probative preserves the

after the shooting, and corroborates the description of the witnesses. (See *People v. Michaels* (2002) 28 Cal.4th 486, 532 [122 Cal.Rptr.2d 285, 49 P.3d 1032]; *People v. Hughes* (2002) 27 Cal.4th 287, 337 [116 Cal.Rptr.2d 401, 39 P.3d 432].) In essence, defendant's objection is that exhibit No. 44 was unnecessary and cumulative because the witnesses had verbally described the scene depicted in the photograph. But as we said in *People v. Price* (1991) 1 Cal.4th 324, 441 [3 Cal.Rptr.2d 106, 821 P.2d 610]: "We have often rejected the argument that photographs of a murder victim should be excluded as cumulative if the facts for which the photographs are offered have been established by testimony. [Citations.] Because the photographic evidence could assist the jury in understanding and evaluating the testimony, we reject the argument here as well."

Relying on Evidence Code section 352, defendant argues that exhibit No. 44, even if relevant, should have been excluded as more prejudicial than probative. The photograph, showing the mortally wounded victim lying unconscious with blood on his head and chest, would undoubtedly unsettle some jurors. But, as we have often noted, " ' " 'murder is seldom pretty, and pictures, testimony and physical evidence in such a case are always unpleasant . . . .' " ' " (*People v. Riel* (2000) 22 Cal.4th 1153, 1194 [96 Cal.Rptr.2d 1, 998 P.2d 969], quoting *People v. Pierce* (1979) 24 Cal.3d 199, 211 [155 Cal.Rptr. 657, 595 P.2d 91].) Here, the nine photographs of the murder victim are less gruesome than many we have seen in other cases at this court. As the trial court remarked, exhibit No. 44 was "not unusually disturbing as this type of evidence goes."

"A trial court has broad discretion in determining the admissibility of murder victim photographs against a claim that the photographs will arouse in the jurors an excessively emotional response." (*People v. Price, supra,* 1 Cal.4th at p. 441.) We find no abuse of discretion here.

---

constitutional issue whether, for the same reason, the admission of exhibit No. 44 violated due process. (See *People v. Partida* (2005) 37 Cal.4th 428, 437–439 [35 Cal.Rptr.3d 644, 122 P.3d 765].)

The Attorney General also asserts that defendant failed to raise a relevancy objection at trial. When the prosecution first offered exhibit No. 44, defendant objected without stating reasons. The trial court sustained the objection on grounds of relevancy. The defense offered to specify the reasons for its objection, but the trial court said that was unnecessary since it was sustaining the objection. Later, at the close of the prosecution case, when the prosecution moved that all exhibits be admitted into evidence, the defense objected to exhibit No. 44 on the ground that the exhibit had *no* probative value and should be excluded under Evidence Code section 352. Under these circumstances, the trial court was fairly informed that the defense was objecting to the relevancy of exhibit No. 44. (See *People v. Partida, supra,* 37 Cal.4th at p. 437.)

## III. PENALTY PHASE ISSUES

All of defendant's penalty phase issues are challenges to the adequacy and constitutionality of the penalty phase procedures and jury instructions. As defendant acknowledges, all have been rejected by this court in previous decisions.

### A. *CALJIC No. 8.85*

CALJIC No. 8.85 lists the factors to be considered by the jury in making its penalty decision. Defendant contends that the trial court should have deleted those factors inapplicable to this case. We rejected that contention in *People v. Smith* (2005) 35 Cal.4th 334, 368–369 [25 Cal.Rptr.3d 554, 107 P.3d 229] (*Smith*); *People v. Sapp* (2003) 31 Cal.4th 240, 315 [2 Cal.Rptr.3d 554, 73 P.3d 433]; *People v. Yeoman* (2003) 31 Cal.4th 93, 164–165 [2 Cal.Rptr.3d 186, 72 P.3d 1166]; *People v. Carpenter* (1997) 15 Cal.4th 312, 421 [63 Cal.Rptr.2d 1, 935 P.2d 708]; *People v. Ghent* (1987) 43 Cal.3d 739, 776–777 [239 Cal.Rptr. 82, 739 P.2d 1250]; and in many other cases.

The trial court is not required to instruct the jury that mitigating factors can only be mitigating. (*People v. Farnam* (2002) 28 Cal.4th 107, 191 [121 Cal.Rptr.2d 106, 47 P.3d 988].) Defendant argues that without such an instruction, the jury might treat the absence of evidence relating to a mitigating factor as aggravating, and that this danger is not eliminated by telling the jury to consider factors only "if applicable" (CALJIC No. 8.85). But we considered and rejected that contention in *People v. Sapp, supra,* 31 Cal.4th at page 315.

Defendant argues that CALJIC No. 8.85's summary of the aggravating and mitigating factors is unconstitutional. First, he claims that the terms "*extreme* mental or emotional disturbance*" in section 190.3, factor (d) (italics added), and "*extreme* duress" and "*substantial* domination" in section 190.3, factor (g) (italics added) unconstitutionally limit the mitigating factors the jury can consider. We rejected that contention in *Smith, supra,* 35 Cal.4th at page 374. (See *People v. Jones* (1997) 15 Cal.4th 119, 190 [61 Cal.Rptr.2d 386, 931 P.2d 960] [factor (d)]; *People v. Visciotti* (1992) 2 Cal.4th 1, 73–75 [5 Cal.Rptr.2d 495, 825 P.2d 388] ["extreme duress" in factor (g)]; *People v. Adcox* (1988) 47 Cal.3d 207, 270 [253 Cal.Rptr. 55, 763 P.2d 906] ["substantial domination" in factor (g)].) Defendant also argues that although *People v. Boyd* (1985) 38 Cal.3d 762, 772 [215 Cal.Rptr. 1, 700 P.2d 782], held that a death judgment could not be based on aggravating factors not listed in section 190.3, CALJIC No. 8.85 did not expressly instruct the jury not to consider nonstatutory aggravating factors. But he does not point to any nonstatutory aggravating factors that were presented to or argued to the jury. Thus defendant's claim raises no issue for decision here. (*People v. Jones* (2003) 30 Cal.4th 1084, 1123 [135 Cal.Rptr.2d 370, 70 P.3d 359].)

## B. *CALJIC No. 8.88*

CALJIC No. 8.88 explains to the jury how it should arrive at the penalty decision. Defendant asserts this instruction violates his rights under the Fifth, Sixth, Eighth, and Fourteenth Amendments to the federal Constitution.

He first argues that CALJIC No. 8.88's language, directing the jury to determine whether aggravation "so outweighs" mitigation as to warrant death, is unconstitutionally vague. We rejected that contention in *People v. Davenport* (1995) 11 Cal.4th 1171, 1231 [47 Cal.Rptr.2d 800, 906 P.2d 1068], and in *People v. Breaux* (1991) 1 Cal.4th 281, 315–316 [3 Cal.Rptr.2d 81, 821 P.2d 585]. We explained that the words used in CALJIC No. 8.88, or words of similar breadth, are essential to avoid reducing the penalty decision to a mere mechanical calculation. (*Smith, supra,* 35 Cal.4th at p. 369; see *People v. Brown* (1985) 40 Cal.3d 512, 541 [230 Cal.Rptr. 834, 726 P.2d 516].)

Defendant then contends that CALJIC No. 8.88 is incorrect because it refers to whether the death penalty is "warranted" instead of whether it is "appropriate." We disagree. In *People v. Arias* (1996) 13 Cal.4th 92, 171 [51 Cal.Rptr.2d 770, 913 P.2d 980], we said: "By advising that a death verdict should be returned only if aggravation is 'so substantial in comparison with' mitigation that death is 'warranted,' the instruction clearly admonishes the jury to determine whether the balance of aggravation and mitigation makes death the appropriate penalty."

Defendant also contends that CALJIC No. 8.88 does not convey to the jury that a life sentence is mandatory if aggravation does not outweigh mitigation. Again we disagree. CALJIC No. 8.88 permits a death penalty only if aggravation is so substantial in comparison with mitigation that death is warranted; if aggravation failed even to outweigh mitigation, it could not reach this level. (See *Smith, supra,* 35 Cal.4th at p. 370; *People v. Medina* (1995) 11 Cal.4th 694, 781 [47 Cal.Rptr.2d 165, 906 P.2d 2].)

Defendant further contends that CALJIC No. 8.88 does not inform the jury that it can impose a life sentence even if there is no mitigating evidence. We explained in *People v. Johnson* (1993) 6 Cal.4th 1, 52 [23 Cal.Rptr.2d 593, 859 P.2d 673], that under the language of CALJIC No. 8.88, "[n]o reasonable juror would assume he or she was required to impose death despite insubstantial aggravating circumstances, merely because no mitigating circumstances were found to exist."

Finally, we have in the past rejected defendant's contention that CALJIC No. 8.88 is defective because it does not require unanimous separate written findings on each of the aggravating circumstances. (*Smith, supra,* 35 Cal.4th at

p. 374; *People v. Coffman and Marlow* (2004) 34 Cal.4th 1, 125 [17 Cal.Rptr.3d 710, 96 P.3d 30].)

### C. *Burden of Proof*

Contrary to defendant's assertion, the federal Constitution does not require that a state death penalty law impose a burden of proof on the prosecution to prove that death is the appropriate penalty, either beyond a reasonable doubt (see *People v. Arias, supra,* 13 Cal.4th at p. 190), or by a preponderance of the evidence (see *People v. Hayes* (1990) 52 Cal.3d 577, 643 [276 Cal.Rptr. 874, 802 P.2d 376]). Because no burden of proof is required at the penalty phase, the law is not invalid for failing to require an instruction on burden of proof. (See *People v. Michaels, supra,* 28 Cal.4th at p. 541; *People v. Ochoa* (2001) 26 Cal.4th 398, 452–454 [110 Cal.Rptr.2d 324, 28 P.3d 78].) Defendant's contention that the trial court should instruct the jury that there is a "presumption of life" at the penalty phase of the trial, analogous to the presumption of innocence at the guilt trial, was rejected by this court in *People v. Kipp* (2001) 26 Cal.4th 1100, 1137 [113 Cal.Rptr.2d 27, 33 P.3d 450].

### D. *Instructions Concerning the Possibility of Parole*

Defendant complains that the jury instructions do not adequately describe the penalty of life without the possibility of parole. He points out that during penalty deliberations the jury sent the trial court a note asking: "(1) Does life without the possibility of parole mean that there are absolutely no circumstances under which the accused defendant can exit state prison while still alive? This question excludes the possibility of escape. (2) If there are such circumstances please explain them." The court responded by instructing the jury that it "must assume that a sentence of life without possibility of parole will be carried out for purposes of determining sentence." The court added: "It would be a violation of the jury's duty to speculate otherwise."

■ The problem is not with the jury instructions. The phrase "without possibility of parole" is clear and on its face absolutely bars parole. The problem is that some jurors may not accept the role of juries in the California death penalty scheme, and instead of making a decision based solely on weighing the aggravating and mitigating circumstances, may seek an assurance that there are no circumstances under which a sentence of life without possibility of parole could be altered to permit parole. The trial court cannot provide such an assurance. (*People v. Kipp* (1998) 18 Cal.4th 349, 378 [75 Cal.Rptr.2d 716, 956 P.2d 1169].) It can explain to the jury that in unusual cases, future action by the judiciary or the Governor may permit a defendant who has been sentenced either to death or to life imprisonment without

possibility of parole to obtain parole, but that the jury should not speculate on such possibility but instead should assume the sentence it reaches will be carried out. (See *People v. Samuels* (2005) 36 Cal.4th 96, 141 [30 Cal.Rptr.3d 105, 113 P.3d 1125] (conc. opn. of Werdegar, J.).) But that is a matter within the trial court's discretion; the court in this case did not err by simply directing the jury to assume that a sentence of life imprisonment without the possibility of parole means that defendant will be confined for life without the opportunity of parole, and telling the jury not to speculate on any events that might lead to a different outcome. (See *People v. Snow* (2003) 30 Cal.4th 43, 123 [132 Cal.Rptr.2d 271, 65 P.3d 749]; *People v. Kipp, supra,* 18 Cal.4th 349, 378–379.)

### E. *Other Constitutional Issues*

■ Defendant asks us to reconsider the United States Supreme Court's decision in *Pulley v. Harris* (1984) 465 U.S. 37, 51 [79 L.Ed.2d 29, 104 S.Ct. 871], which held that California's death penalty law is constitutional although it does not provide for proportionality review. Presumably defendant raises this contention to preserve the issue for federal review, as we have no authority to reconsider decisions of the United States Supreme Court.

■ Finally, defendant contends that California's death penalty law violates international law. He first asserts that it violates the International Covenant of Civil and Political Rights, which prohibits the "arbitrary" deprivation of life (art. VI, § 1) and bars "cruel, inhuman or degrading treatment or punishment" (art. VII). The covenant, however, specifically permits the use of the death penalty if "imposed only for the most serious crimes in accordance with the law in force at the time of the commission of the crime." (Art. VI, § 2; see *People v. Cornwell* (2005) 37 Cal.4th 50, 106 [33 Cal.Rptr.3d 1, 117 P.3d 622].) And when the United States ratified the treaty, it specially reserved the right to impose the death penalty on any person, except a pregnant woman, duly convicted under laws permitting the imposition of capital punishment. (See 138 Cong. Rec. S-4718-01, S4783 (1992); *People v. Brown* (2004) 33 Cal.4th 382, 403–404 [15 Cal.Rptr.3d 624, 93 P.3d 244].)

Defendant also argues that the "regular" imposition of capital punishment in California violates international norms, and hence constitutes cruel and unusual punishment in violation of the Eighth and Fourteenth Amendments to the federal Constitution. This is a variation on the familiar argument that California's death penalty law does not sufficiently narrow the class of death-eligible defendants to limit that class to the most serious offenders, a contention we have rejected in numerous decisions. (See *People v. Jones, supra,* 30 Cal.4th at pp. 1127–1128; *People v. Wader* (1993) 5 Cal.4th 610, 669 [20 Cal.Rptr.2d 788, 854 P.2d 80].)

## IV.  DISPOSITION

The judgment is affirmed.

George, C. J., Baxter, J., Werdegar, J., Chin, J., Moreno, J., and Corrigan, J., concurred.