Filed 4/3/14  P. v. Garcia CA4/2

**NOT TO BE PUBLISHED IN OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

# IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

## FOURTH APPELLATE DISTRICT

## DIVISION TWO

| | |
|---|---|
| THE PEOPLE, | |
| Plaintiff and Respondent, | E057862 |
| v. | (Super.Ct.No. RIF1100946) |
| JUAN ARGUETA GARCIA, | OPINION |
| Defendant and Appellant. | |

APPEAL from the Superior Court of Riverside County.  Jean P. Leonard, Judge.  Affirmed.

Doris M. LeRoy, under appointment by the Court of Appeal, for Defendant and Appellant.

Kamala D. Harris, Attorney General, Dane R. Gillette, Chief Assistant Attorney General, Julie L. Garland, Assistant Attorney General, Eric A. Swenson and Barry Carlton, Deputy Attorneys General, for Plaintiff and Respondent.

Juan A. Garcia, defendant, was convicted by a jury of 14 counts of molestation (Pen. Code, §§ 288, subd. (a); 288, subd. (c)(1); 289, subd. (d); 269, subd. (a)(1); 261,

1

subd. (a)(2); 288a, subd. (c)(2))[1] committed against his five daughters, over the course of several years. The jury also made a finding that the acts were committed against multiple victims on separate occasions. (§ 667.61, subd. (e)(5).) He was sentenced to an indeterminate term of 105 years to life, which was ordered to run consecutive to a determinate term of 10 years, and appealed.

Appellate counsel initially filed a brief in accordance with the procedures outlined in *People v. Wende* (1979) 25 Cal.3d 436. We requested supplemental briefing to address the questions of whether the trial court erroneously admitted a photograph of the defendant's genitalia, and whether there was instructional error relating to the evidence of defendant's physical discipline of the children, as well as the abuse of his spouse. We affirm.

## BACKGROUND

Defendant and his wife, Elizabeth Garcia, have six children together: Jane Doe 1, born in 1989; Jane Doe 2, born in 1990; Jane Doe 3, born in 1994; Jane Doe 4 and Jane Doe 5 (Jane Doe 4's twin), born in 1995, and John Doe 6, born in 1997.

In 1992 or 1993, the family moved to an address in Perris, California. The family was very religious, Apostolic Christian, which meant the girls wore very modest dresses or skirts that came below the knee, wore their hair long, no makeup or jewelry other than a watch. Defendant controlled the money, set rules for the family, and often was physically violent with Elizabeth and the children. Defendant would discipline the

---

[1] All further statutory references are to the Penal Code unless otherwise indicated.

2

children using his hand, a belt, a branch or a stick, frequently resulting in bruises, and occasionally drawing blood.

Defendant and his family lived for 15 years in Perris. Elizabeth, defendant's wife, slept a lot due to her depression, and took medication for migraines that made her sleepy; she was a heavy sleeper. Defendant and his wife had a master bedroom with a bathroom. With eight people living in the house, it was not unusual for the children to shower in the master bathroom.

Jane Doe 1 (Counts 1-4)

When Jane Doe 1 was approximately 12 years old, she went to sleep in her parents' bed upon the family's return from a swap meet. During the night, she awoke to find defendant caressing her breasts over her clothing. She initially thought it was an accident, but it recurred at least once a week between the ages of 12 and 13. Defendant also kissed her once with his tongue when she was about 14 years old, and on this occasion he touched her breasts under her clothes.

When Jane Doe 1 was about 15 years of age, she caught defendant peeking at her as she showered. This happened more than ten times. When Jane Doe 1 was 15 or 16, defendant grabbed her arm and made her touch his penis after he touched her breasts.

While the family was on a trip to visit friends and relatives in Texas and Mexico, defendant got into bed after Jane Doe 1 had retired and caressed her breasts. Jane Doe 1 eventually pushed him off and she slept on the floor. During the trip to Texas, defendant also placed her hand on his groin two times while they were driving. When the family was in Mexico, defendant hugged Jane Doe 1 and she ended up on top of him on the bed.

3

Defendant hugged her, and kissed her on the face and chest until a noise made him stop. On another occasion when Jane Doe slept in the bed with her parents, defendant put his hands on her hips and moved her in a grinding motion. This happened more than 10 times.

Defendant also digitally penetrated Jane Doe 1 on one occasion when she was approximately 16, while she was asleep in the bed with her parents, startling her awake. (2 RT 198-199} Although her mother slept deeply due to medication she was taking, when Jane Doe 1 gasped, it woke her mother up.

Once, defendant purchased alcohol for Jane Doe 1 and she drank a lot, although drinking was not permitted in the home. Defendant put her into the shower and tried to undress her, but Jane Doe 1 would not let him. Her mother was asleep when Jane Doe 1 got out of the shower, and at some point Jane Doe 1 heard Jane Doe 2 yell at defendant. Jane Doe 2 made Jane Doe 1 go to her own room. The next day, Jane Doe 1 and Jane Doe 2 promised each other that neither would leave the house until Jane Doe 5 was 18.

Jane Doe 1 did not tell anyone what was happening when she was 12 to 13 years of age for fear it would break up the family. However, at some point she told Jane Doe 2 that defendant was mistaking her for her mother. Jane Doe 1 and Jane Doe 2 made a pact to prevent defendant from doing similar things to their siblings. However, when she learned that Jane Doe 2 planned to go away to college, Jane Doe 1 felt she could no longer stay at the home. Jane Doe 1 moved out when she was 19.

After she had moved out, Jane Doe's mother called her to find out why she had left, and Jane Doe 1 finally told her what defendant had done. When Jane Doe 1's

4

mother confronted defendant, he denied it, but threatened to have the children taken away if the mother called the police.

At some point, Jane Doe 1 received a telephone call in which she learned that Jane Doe 3 had been molested by defendant. When the call terminated, Jane Doe 1 telephoned CPS to make a report of the sexual abuse.

Jane Doe 2 (Count 5)

Jane Doe 2 shared a bedroom with Jane Doe 1. When Jane Doe 2 was between the ages of 12 and 14 years old, defendant came into her bedroom and cupped her under her breasts; he did this a approximately 10 to 15 times. On one occasion, defendant tried to lift up her skirt. On five or seven occasions, defendant came into the bathroom while she was taking a shower. Defendant also bought underwear for his daughters and asked Jane Doe 1 and Jane Doe 2 to model the underwear for him, but they refused.

When Jane Doe 2 was approximately 14 years old, she began to notice that Jane Doe 1 was not sleeping in her own bed once or twice per week. Jane Doe 2 was present in the master bedroom on an occasion when defendant gave Jane Doe 1 alcohol to drink. Jane Doe 2 observed that Jane Doe 1 was about to get sick and was going to pass out, and tried to take care of Jane Doe 1, but defendant said Jane Doe 1 was fine and that he would take her into the shower. After undressing Jane Doe 1 and putting her in the shower, defendant put Jane Doe 1 in the bed to sleep. Jane Doe 2 stayed in the room and slept on the floor to watch over Jane Doe 1 because she had seen things between defendant and Jane Doe 1 previously.

5

After the television was turned off, Jane Doe 2 heard sounds on the bed and turned on the light. She observed Jane Doe 1 positioned on top of her father's chest in her underwear, nonresponsive. Jane Doe 2 yelled at defendant, who in turn told Jane Doe 2 she was a pervert. As soon as the light was turned on, defendant threw Jane Doe 1 off of him. The girls' mother woke up but defendant told her Jane Doe 1 had been sick so he had taken her into the shower, and that Jane Doe 2 must have had a nightmare.

At some point, Jane Doe 1 told Jane Doe 2 what had been going on, but was not specific. Jane Doe 1 and Jane Doe 2 created a buddy system, telling the other children to make sure that someone was there to guard and to avoid using the parent's bathroom. After Jane Doe 1 moved out, defendant did not do anything to Jane Doe 2 that made her uncomfortable. However Jane Doe 2 did see defendant hugging Jane Doe 3.

Jane Doe 2 talked her sisters and asked them if anything was going on. Jane Doe 3, Jane Doe 4, and Jane Doe 5 all related instances of molestation. Jane Doe 2 confronted defendant and told him he would not bother them anymore because she would protect them. However, when Jane Doe 2 was approximately 19 years old, she had a nightmare in which Jane Doe 3 reported being raped by defendant. Jane Doe 2 talked to Jane Doe 3 and learned that defendant had lifted up her shirt and put her breasts against his chest.

Then Jane Doe 2 telephoned Jane Doe 1, who in turn called CPS.

Jane Doe 3 (Counts 6-8)

Jane Doe 3 observed defendant physically abuse her siblings and her mother. Defendant also hit Jane Doe 3 when he was angry. When Jane Doe 3 was approximately 13 years old, defendant came into her bedroom, pulled her shirt up, pulled her close to

6

him, and kissed her, while fondling her breasts. He did this more than three times. On other occasions, defendant touched her thigh and crotch area. Defendant also put his hand inside her crotch area, under her clothing. Jane Doe 3 also described occasions when defendant came into the bathroom to look at her while she showered.

On one occasion after school, defendant locked Jane Doe 3 in the bathroom and sucked her breasts. On another occasion, while Jane Doe 3 did her homework on the computer, defendant grabbed her hand, led her into the garage, laid her down and put his hands inside her. Defendant put his hands in her crotch area on her 15th birthday, and at her Quinceanera, he kept looking down her dress.

When Jane Doe 3 was 15, defendant made her sit with him at the computer as he looked at a pornographic website. At the computer, defendant touched her crotch area, so Jane Doe 3 got up and went to her room. On the last day of school when Jane Doe 3 was in the 8th grade, defendant picked her up from school. In the vehicle he touched her breasts and beat her up. In the summer, after 8th grade, defendant licked her crotch area.

Jane Doe 3 was friends with Cesar O. throughout high school. Cesar observed bruises on Jane Doe 3 on multiple occasions, usually on her back and arms. In their sophomore year, Jane Doe 3 eventually told Cesar about the physical and sexual abuse that was going on in the home. Cesar even went to talk to Jane Doe 3's mother about the physical abuse, and was told that the mother would handle it.

Jane Doe 4 (Counts 9-13)

Jane Doe 4 and Jane Doe 5 are twins. Jane Doe 4 witnessed domestic violence in the home and described how defendant became violent with the children if they did not

7

do their chores.  Defendant drew blood on Jane Doe 4 when he once struck her in the face, giving her a bloody nose and cut lip because she did not want to eat.

When Jane Doe 4 was in 6th grade, defendant touched her chest, under her clothing.  He also touched her chest when she was in the 7th grade, when he took her into the bathroom after she had gotten into trouble at school.  At some point, defendant began touching her vagina under her clothing and underwear.  Defendant also put his mouth on Jane Doe's chest on two occasions, and put his mouth on her vagina.  Defendant also orally copulated Jane Doe 4 approximately five times.  When she was 14, defendant made Jane Doe 4 touch his penis with her hand, once in the bathroom, and once in the car.  Between the ages of 11 and 15, when Jane Doe 4 took a shower, defendant would look in at her and tell her she was beautiful.

The touching stopped when defendant started to rape her at age 13.  The first rape occurred when defendant called Jane Doe 4 into his room to bring him a glass of water.  When Jane Doe 4 brought him the water, he pulled up her skirt and penetrated her vagina with his penis on the floor of the master bedroom, eventually ejaculating.  Defendant told Jane Doe 4 that if she told anyone about the molestation, he would kill her mother.

Defendant raped Jane Doe 4 several times between the ages of 13 and 15.  Jane Doe 4 saw his penis and noted that he had a mole on the right side of it.  The second assault occurred when defendant had left John Doe 6 in the car, ostensibly to go back into the house to get something.  After waiting in the car for 30 to 45 minutes, John Doe 6 became irritated and went to look for defendant.  Defendant had pulled down Jane Doe

4's skirt and touched her butt, and was pressing her close to him when John Doe 6 interrupted the act. John Doe 6 recalled this incident.

The next rape occurred when Jane Doe 4 was 14; it occurred in the bathroom after the mother had left for work. The next rape occurred when Jane Doe 4 was 15. Jane Doe 4 had gotten defendant's clothes ready so he could shower, when he raped her on the floor of the master bedroom. Shortly after the rape began, John Doe 6 tried to enter the master bedroom looking for Jane Doe 4, so defendant made Jane Doe 4 get under the bed. Defendant made it look like Jane Doe 4 was hiding under the bed by looking under the bed and asking Jane Doe 4 what she was doing. John Doe 6 recalled this incident.

When Jane Doe 4 was in 7th grade, Jane Doe 3 told Jane Doe 4 she had been touched inappropriately by defendant. When Jane Doe 4 was about 14, she told Jane Doe 2 about defendant's inappropriate touching, so Jane Doe 2 instituted a buddy system. Defendant frustrated the buddy system by sending John Doe 6 to do a task so defendant could be alone with the girls. When first interviewed by the police, Jane Doe 4 did not disclose all the things defendant had done. However, after the initial allegations had been made, Jane Doe 4 told her mother that defendant had raped her. This was the first time Jane Doe 4 had told anyone about the rapes.

Jane Doe 5 (Count 14)

When defendant was angry with Jane Doe 5, he would take her into the bathroom, has he had done with Jane Doe 3 and Jane Doe 4. He told her, as he had told Jane Doe 4, that he would make her wish she had never been born. Once, Jane Doe 5 had seen defendant lift up Jane Doe 3's shirt and touch Jane Doe 3's breasts.

On one occasion, defendant slapped her, then sat her on his lap and looked down her shirt. He also touched her breasts, under her clothing. Defendant grabbed her butt once, when she was in the kitchen. Defendant also put his hand down Jane Doe 5's pants, and massaged her vagina with his hands, but he stopped when she urinated on him. Jane Doe 5 told Jane Doe 3 about the incident. When Jane Doe 5 was 15, defendant touched her vaginal area for the last time, after he and the mother returned from a trip to Mexico. Jane Doe 5 informed Jane Doe 4 about the inappropriate touching.

Defendant was charged by way of information[2] with 5 counts of lewd and lascivious acts with a person under the age of 14[3] (§ 288, subd. (a), counts 1, 2, 3, 5, 6), three counts of lewd and lascivious acts upon persons 14 or 15 by a person at least 10 years older (§ 288, subd. (c)(1), counts 8, 13, 14), one count of penetration with a foreign object (§ 289, subd. (d), count 4), three counts of oral copulation (§ 288a, subd. (c)(2), counts 7, 11, 12), one count of aggravated sexual assault upon a child under 14 (§ 269, subd. (a)(1) [rape], count 9), and one count of rape by force (§ 261, subd. (a)(2), count 10). It was further alleged that defendant committed violations of section 288, subdivision (a), against more than one victim, within the meaning of section 667.61, subdivision (e)(5).

---

[2] In the information, defendant's name appears as Juan Garcia Argueta.

[3] Some counts were amended to conform to the evidence during trial. We refer to the counts of the amended information here because those represent the charges presented to the jury.

He was tried by a jury which convicted him on all counts, and made a true finding on the multiple-victim allegation. At sentencing, probation was denied and defendant was sentenced to a determinate sentence of 8 years for count 4, with consecutive determinate terms of 8 months each (one-third the midterm of 2 years) for counts 8, 13, and 14, for a total determinate sentence of 10 years in prison. The court also imposed consecutive indeterminate terms of 15 years to life for counts 1, 5, 7, 9, 10, 11, and 12, for a total indeterminate term of 105 years to life. The court imposed concurrent indeterminate terms of 15 years to life on counts 2, 3, and 6.

Defendant timely appealed.

**DISCUSSION**

Defendant initially filed a brief in accordance with the procedures outlined in *People v. Wende* (1979) 25 Cal.3d 436 and requested that we undertake an independent review of the entire record. We requested supplemental briefing, which the parties have provided.

**1. Error in Admitting Photograph of Defendant's Genitalia.**

Because the rape victim (Jane Doe 4) described a mole on defendant's genitalia during her interview, the People proffered photographs of defendant's body part to corroborate what the victim would say. The defendant objected on the ground that the probative value of the photographs was outweighed by prejudice. The court found the photographs were relevant and their probative value was not outweighed by undue prejudice. Prior to Jane Doe 4's testimony, the investigator for the District Attorney's office testified about taking the photographs, and identified the photographs. The

11

photographs were then published to the jury.  Subsequently, defendant's wife testified, and described the mole on the defendant's genitals.  Ultimately, Jane Doe 4 testified that when defendant raped her, she observed a mole on his penis.  The evidence was cumulative and unduly prejudicial, but the error was harmless.

Only relevant evidence is admissible, and evidence is relevant if it has "any tendency in reason to prove or disprove any disputed fact that is of consequence to the determination of the action."  (Evid. Code, §§ 210, 350.)  "The court in its discretion may exclude evidence if its probative value is substantially outweighed by the probability that its admission will (a) necessitate undue consumption of time or (b) create substantial danger of undue prejudice, of confusing the issues, or of misleading the jury."  (Evid. Code, § 352.)  Evidence Code section 352 thereby gives the trial court wide latitude to balance the evidence's probative value against the risk of undue prejudice.  (*People v. Crittenden* (1994) 9 Cal.4th 83, 133-134 (*Crittenden*).)

The admission of photographs lies within the broad discretion of the trial court under Evidence Code section 352, when a claim is made that they are unduly inflammatory.  (*People v. Howard* (2008) 42 Cal.4th 1000, 1023.)  The trial court's exercise of discretion will not be disturbed on appeal unless the probative value of the photographs is clearly outweighed by their prejudicial effect.  (*Ibid.*; *People v. Watson* (1956) 46 Cal.2d 818.)

Pursuant to Evidence Code section 352, the trial court may exclude cumulative evidence if it would confuse the jury or obscure the issues.  (*People v. Filson* (1994) 22 Cal.App.4th 1841, 1850, disapproved on other grounds, *People v. Martinez* (1995) 11

12

Cal.4th 434, 448.) However, evidence that is identical in subject matter to other evidence should not be excluded as "cumulative" if it has greater evidentiary weight or probative value. (*People v. Mattson* (1990) 50 Cal.3d 826, 871.) Photographs are not cumulative simply because they illustrate facts otherwise presented through testimony. (*People v. Anderson* (2001) 25 Cal.4th 543, 592.)

Thus, in the context of photographs of murder victims, some courts have rejected the argument that they should be excluded as cumulative if the facts for which the photographs are offered have been established by testimony. (See *People v. Perry* (2006) 38 Cal.4th 302, 318, and cases there cited.) The rationale of these cases was that the photographic evidence could assist the jury in understanding and evaluating the testimony. (*Ibid.*, quoting *People v. Price* (1991) 1 Cal.4th 324, 441.)

It has also been observed that the jury is entitled to see details of a victim's body to determine if the evidence supports the prosecution's theory of the case. (*People v. Gurule* (2002) 28 Cal.4th 557, 624.) In this respect, photographs showing the manner in which a victim was wounded are relevant to the determination of malice, or premeditation and deliberation, or aggravation and penalty. (*People v. Wader* (1993) 5 Cal.4th 610, 655 [photographs relevant to malice, aggravation or penalty]; see also *People v. Lucas* (1995) 12 Cal.4th 415, 450; *Crittenden*, *supra*, 9 Cal.4th at p. 133 [photographs relevant to show premeditation, deliberation].) In such cases, the prosecutor is not obliged to prove those details solely from the testimony of live witnesses. (*Crittendon, supra,* at p. 133.) The jury is entitled to see how the physical details of the scene and the body support the prosecution's theory. (*Ibid.*) The

13

photographic evidence is considered relevant even when offered to clarify matters that are not in dispute. (*Id.* at p. 132.)

But we deal not with photographs of a victim. Although the People claim the photographs of defendant's penis were relevant because it was an instrumentality of his crimes against Jane Doe 4, the offer of proof made in the trial court was that the photographs corroborated the victim's testimony. As such, the photographs, which are inherently offensive, were cumulative, and the presentation of this evidence involved undue consumption of time where the victim's mother corroborated her testimony by describing the mole and defendant never denied this fact. Further, because there was no forensic evidence offered to show particular injuries to Jane Doe 4 which could only be caused by a particular penis, the photographs did not clarify the victim's testimony. In any event, where the evidence showed there were two bathrooms shared by a large family, the fact that Jane Doe 4 could describe her father's penis is not unusual.

The offensive nature of the photographs of defendant's intimate body parts resulted in prejudice that outweighed any probative value. However, the weight of the remaining evidence, including the testimony of John Doe 6, who interrupted more than one sex act, independently corroborating Jane Doe 4's testimony, renders any error harmless.

## 2. Lack of Instructions Regarding Defendant's Physical Abuse of His Children and his Wife.

Throughout the trial, the prosecution presented evidence of defendant's harsh discipline and physical abuse of his children, as well as of his wife. Prior to instructing

14

the jury, the prosecution requested that the court read CALCRIM No. 375, to guide the jury in its consideration of this evidence. The defendant objected. The court refused to give that instruction because CALCRIM No. 1191 was a more appropriate instruction for the evidence of uncharged lewd acts. The court invited the prosecutor to submit a revised instruction to address the evidence of defendant's physical discipline.

In the end, there were no instructions to guide the jury's consideration of extensive evidence of defendant's physically abusive nature, which did not qualify as uncharged acts to prove any circumstance under Evidence Code section 1101, subdivision (b). We requested supplemental briefing to give the defendant an opportunity to raise a challenge to the lack of instructions limiting the jury's consideration of what otherwise constituted bad character evidence. (Evid. Code, § 1101, subd. (a).) Defendant has declined our invitation.

**DISPOSITION**

The judgment is affirmed.

NOT TO BE PUBLISHED IN OFFICIAL REPORTS

RAMIREZ
P. J.


We concur:

McKINSTER
J.

KING
J.

15