# IN THE SUPREME COURT OF CALIFORNIA

THE PEOPLE,

Plaintiff and Respondent,

v.

WILLIAM JENNINGS CHOYCE,

Defendant and Appellant.

S169090

San Joaquin County Superior Court

SF98079A

---

July 21, 2025

Justice Evans authored the opinion of the Court, in which Chief Justice Guerrero and Justices Corrigan, Liu, Kruger, Groban, and Jenkins concurred.

---

PEOPLE v. CHOYCE

S169090


Opinion of the Court by Evans, J.


A jury convicted defendant William Jennings Choyce of the first degree murders of Gwendolyn Lee, Lawanda Beck, and Victoria Bell (Pen. Code, § 187, subd. (a));[1] found true enhancements alleging that these murders were committed through the personal use of a firearm (§§ 12022.5, subd. (a); 12022.53, subd. (d)); and found true the two special circumstance allegations that these murders were committed during the course of a rape (§ 190.2, subd. (a)(17)(c)) and that Choyce had committed multiple murders (§ 190.2, subd. (a)(3)). The jury also found Choyce guilty of the rape and sexual penetration with a foreign object of Yvette R. (§ 261, subd. (a)(2); § 289, subd. (a)), as well as finding true allegations that Choyce kidnapped Yvette R. (§ 667.61, subd. (d)(2)), that he tied or bound her (§§ 667, subd. (e)(5); 1170.84), and that he personally used a gun during this offense. (§§ 12022.3; 12022.5, subd. (a).)

The jury returned a verdict of death for each of the three murder convictions. The court entered a judgment of death. The court also imposed a term of 81 years to life for the other offenses and enhancements.

This appeal is automatic. (§ 1239, subd. (b).) For the reasons that follow, we affirm the judgment in its entirety.

_____

[1]    All undesignated statutory references are to the Penal Code.

1

# I.     FACTUAL BACKGROUND

Choyce was convicted of three murders and a rape that occurred in Stockton and Oakland between 1988 and 1998. He conceded that his DNA matched the DNA samples recovered from the victims.

## A. Guilt Phase

### 1. Prosecution Evidence

#### a. Murder of Victoria Bell

At around 1:50 a.m. on April 3, 1988, Oakland Police Sergeant Ralph Lacer discovered Victoria Bell's body in an industrial area in West Oakland known for drug use and prostitution. Bell's body appeared to have been "posed" to display her exposed genitals and breasts. Given the position of Bell's body, Sergeant Lacer believed there could be a sexual component to the crime. There were twine bindings on or near Bell's ankles, which showed signs of abrasion, and the soles of Bell's feet were clean, suggesting to Sergeant Lacer that Bell had been bound and killed elsewhere and placed at the crime scene.

The pathologist who conducted the autopsy determined that Bell was killed by a gunshot to the back of her head fired from 18 to 24 inches away. At the time of her death, Bell had .08 micrograms per milliliter of morphine, metabolized from heroin, in her system. A contraceptive sponge was removed from Bell's vagina and preserved for subsequent forensic testing. Based on later DNA testing, Choyce was the source of the sperm found both on the contraceptive sponge and the vaginal swab recovered from Bell's body.

b. *Rape of Yvette R.*

On the evening of December 14, 1994, Yvette R. had a fight with her husband, left her home, and walked towards her mother's house. A man approached her in a white truck and asked if she wanted a ride. Yvette R. declined, but the man turned his truck around and approached her again. Yvette R. told the man to leave her alone. The man then pulled her into the truck through the passenger door, handcuffing her. He then drove to a house and dragged her inside.

Inside the house, the man tore off her clothes and threatened to kill her with the pistol he was holding, calling her things like "dirty bitch[.]" The man then raped and sodomized Yvette R., and forced her to orally copulate him. When Yvette R. cried and pleaded to stop the assault, he responded by saying "shut the fuck up bitch" and "quit whining." Ultimately, he uncuffed Yvette R. and let her get dressed, then drove her back to where he had abducted her. On the way, the man told Yvette R. he had recently been released from prison.

After Yvette R. returned home, her husband called the police. Stockton Police Officer William Hutto took Yvette R. to the hospital for a medical evaluation and to collect evidence for a rape kit, which was conducted several hours after the rape. On their way to the hospital, Yvette R. directed Officer Hutto to the house in Stockton where she had been raped. The house was located at Tilden Park Street. At the hospital, oral and vaginal swabs were collected during a sexual assault exam.

Yvette R. told Officer Hutto about the wrist pain she was feeling; the officer noted several small thin red marks on both of her wrists. Officer Hutto asked Ms. R. about the gun wielded by her attacker, and she told him it was a .38-caliber revolver.

3

Police later executed a search warrant for the house located on Tilden Park, which was then occupied by Choyce, his common-law wife Victoria Brown, and their children. Brown and the children were present on December 22, 1994, when the house was searched, but Choyce was not. Among the items recovered in that search were an Interarms .38-caliber revolver and documents indicating that Choyce lived in the house. The police later returned that .38-caliber pistol to Brown.

Choyce and his first wife, Alice Swafford, co-owned a .38-caliber revolver, of which Choyce took possession when they divorced. Brown and Choyce jointly owned a Mazda Sundowner pickup truck. Choyce started dating Brown in 1988.

### c. *Murder of Gwyndolyn Lee*

On July 2, 1997, workers found Gwyndolyn Lee's partially clothed dead body in a barn in an agricultural area in San Joaquin County.[2] Lee's head was under a board, next to a tractor; her red dress had been pulled up to expose her buttocks; and she was not wearing underwear. Based on the condition of her body, investigating officers concluded that Lee was killed elsewhere and brought to the barn.

The pathologist who conducted the autopsy determined that Lee had died earlier that morning from a gunshot wound to the head fired 18 to 24 inches away. Two bullet fragments were removed from the back of Lee's head. Lee had 25.7 micrograms per milliliter of benzoylecgonine, a metabolite of cocaine, in her system. Testing also revealed cocaine and a quantity of 0.07 percent alcohol in her blood.

---

[2] Lee had been arrested for prostitution before her death.

4

The bullet fragments recovered from Lee's body were submitted for analysis by a forensic laboratory. Dean DeYoung, a criminalist and ballistics expert at the laboratory, testified that he tested and compared the .38-caliber bullet fragments recovered from Lee with another .38-caliber bullet that was later recovered from Lawanda Beck and that both bullets were fired from the same gun. The bullets recovered from Lee's and Beck's bodies were likely fired through either a .357 Magnum, .38 Special, or a .38 Smith and Wesson revolver.[3] DNA testing revealed that Choyce was the major contributor of the foreign DNA found on Lee's oral swab.

### d. Murder of Lawanda Beck

On the morning of August 11, 1997, San Joaquin County Sheriff's Captain Bruce Wuest found Lawanda Beck's naked body in an uninhabited industrial area. Captain Wuest observed a gunshot wound to the back of her head, and believed Beck had been murdered somewhere else, transported to the site, and "dumped" in a face down position with her buttocks in the air.

The autopsy revealed that Beck was killed by a contact gunshot wound to the base of the skull, had been bound or tied up before she was killed, and had cocaine, a cocaine metabolite, and methamphetamine in her blood when she died. During the autopsy, a bullet was retrieved from Beck's brain and a vaginal swab was taken. DNA testing showed that Choyce was the source of the seminal fluid found from a vaginal swab taken from

---

[3] After a domestic dispute between Choyce and Brown in December of 1998, officers responded to Choyce's house on Tilden Park Street and retrieved a .38-caliber revolver from the bedroom.

Beck's body. As noted, an expert testified that the bullet recovered from Beck's body was fired by the same gun as the fragments recovered from Lee's body.

A caretaker for a building near the area where Beck's body was found testified that he saw a pickup truck parked about a quarter mile away late at night on August 10, 1997, in an area where he knew corpses had been found previously. The caretaker said he saw someone get out of the truck, walk around to the back of the vehicle, then get back in the truck and drive off. When the truck drove past him, he saw that it looked like an "early '90s" Ford Ranger. Russell Kamabayashi, an employee at a Ford dealership, testified that a Mazda series B pickup from the early to mid-1990s can easily be confused with a Ford Ranger pickup of the same vintage.

### e. Rape of Cadine W.

The parties stipulated that on April 4, 2002, Choyce was convicted in Alameda County Superior Court of the rape by force or violence of Cadine W.

### 2. Defense Evidence

The defense introduced no evidence at the guilt phase.

## B. Penalty Phase

### 1. Prosecution Evidence

The prosecution presented evidence of several incidents of uncharged criminal activity by Choyce involving violence or the threat to use violence. (§ 190.3, subd. (b).)

On October 22, 1985, an officer observed Choyce talking with a prostitute. When Choyce was detained, the officer discovered a loaded .38-caliber revolver under Choyce's seat and

cocaine in his pocket. Choyce was arrested for possessing a loaded weapon in a car.

Brown testified that as a result of an altercation with Choyce in December of 1998, she applied for a restraining order because she did not think she should live with Choyce any longer. Brown explained in her application for the restraining order that, on the night of the altercation, Choyce threatened to "stomp the fucking shit out of [her]" if she disciplined her son. She also wrote that she feared he would physically harm her, though she testified he never actually physically harmed her.

Cadine W. provided details concerning the facts underlying Choyce's conviction for rape that had been admitted during the guilt phase. She testified that she was working as a prostitute in July of 2001 when Choyce picked her up in a van at 32nd Street and San Pablo Avenue in Oakland. When she entered Choyce's van, he waved a black automatic pistol at her, and ordered her to "suck his dick." He later threatened to kill her and called her a "whiny bitch" when she complained. Choyce sodomized her and penetrated her vagina with his gun, and Cadine W. feared that he would pull the trigger and kill her. Choyce threatened to kill her if she told anyone. Choyce ultimately let her go, but took $200 from her purse first.

Officer Bruce Vallimont testified about Choyce's subsequent arrest for the rape of Cadine W. On July 15, 2001, Cadine W. told him she had been raped and robbed two months earlier while working as a prostitute. As they talked on the street, she described both the man who attacked her and the van he was driving, and then suddenly pointed to a passing van and said it was the same one she had been raped in. Cadine W. identified Choyce as the man who had raped her: There was

"[n]o doubt in [her] mind" that Choyce was her attacker and she was "100 percent" certain Choyce was the man who raped her in his van. After Choyce was arrested, officers inspected his van. Inside, they found cocaine, a loaded nine-millimeter pistol, a box of ammunition, a stun gun, 10-inch plastic ties, a rope, a crossbow and crossbow arrows, a bb gun, and duct tape. At the time of his arrest, Choyce was wearing a shirt that said "I hate whiny bitches."

Cadine W. also testified about the emotional impact of the rape. Even eight years after the incident, she still woke up in the night screaming. She had never been that afraid in her life. She also started drinking a lot and taking drugs after the rape.

Tamisha P. testified that in 2001 she was working as a prostitute in Oakland when she entered Choyce's van. Once Choyce parked the van, Choyce pulled out a gun and sexually assaulted her with it, threatening to "blow . . . [her] fucking head off." Tamisha P. later identified Choyce from a photo lineup as the man who raped her.

The prosecution put on 17 relatives of victims Lee, Beck, and Bell, as well as Yvette R. to testify about the impact of the charged crimes.

Two witnesses provided victim impact testimony for Bell's murder: her brother-in-law, Terry Bell, and her daughter, Crystal Bell. Crystal Bell testified that she lost her mother when she was two and had since received counseling as a result. Bell's brother-in-law, Terry Bell, spoke of Beck's love for her children, her struggles with heroin addiction, and her love of life.

Eight of Lee's family members provided victim impact evidence: her sisters, Vera Scott, Pinky Tipton, and Valerie Lee;

her mother, Helen Lee; her husband, David Barnett; her daughters, Jamilla Mitchell and Jenai Roland; and her niece, Denise Lopez-Atherton.

Vera Scott testified that her sister's death left a "void that could never be filled," and was hard on her whole family. Pinkey Tipton, another sister, testified that she was personally so devastated by the murder that her career suffered and that her entire family was hurt and upset afterward. Lee's younger sister, Valerie, was also devastated by her sister's murder. Lee's mother, Helen, explained that the murder still hurt her years later. Lee's daughter, Jamilla Mitchell, was 16 when her mother died, and said she became hysterical and fainted when she learned about it. Mitchell said she engaged in self-abusive behavior after her mother's death, which she considered a byproduct of the murder. Jenai Roland, Lee's other daughter, felt lost and confused after the murder and sought out counseling. David Barnett, Lee's husband, "gave up" on life after her death and saw his career go "down the drain" as a result. Denise Lopez-Atherton, Lee's niece, said it had been very hard to lose her favorite aunt and she would always feel the impact of the loss.

Five of Beck's family members testified: her sister-in-law, Janice Palmer; her foster mother, Velma Toups; her son, Christopher Beck; her niece, Shirley Annals; and her children's father, Gary Stuckey. Toups, who identified Beck's body at the crime scene and saw the bullet wound in her head, was greatly affected by the murder. Beck's son, Chris, was eight when his mother was murdered and therefore missed the chance to be close to her and was deprived of having a mother as he grew up. Annals testified her aunt had been like a mother to her and that she was shocked and hurt by the murder. Stuckey, whose three

children with Beck included Chris, was stunned to hear of her death. Stuckey explained that Chris reacted strongly to his mother's death and went from a straight-A student to a complete failure. Palmer testified that she and Beck were like sisters, and that the murder was devastating to the whole family.

### 2. *Defense Evidence*

Psychologist Dr. Gretchen White created a psychosocial history of Choyce's early life, focusing on relationships between his family members, environmental stressors, and his individual resources through age 12. After speaking extensively with Choyce and his family members, Dr. White opined that Choyce developed great rage toward women because of abuse by his "brutal" and "controlling" mother, Aurice Choyce. Dr. Douglas Tucker, a forensic psychiatrist who also interviewed and examined Choyce, testified that he suffered from the mental disorder of sexual sadism as a result of the abuse he experienced during childhood.

Dr. White described Aurice as an extremely angry and volatile parent, stating that Aurice's treatment of Choyce made him fearful and anxious, and impaired his mental and emotional development. According to Dr. White, the important features of Choyce's childhood experience were that he was deprived of normal parental affection and that there was a hyper-sexualized atmosphere in the family home. Dr. Tucker expanded on Dr. White's testimony, opining that the combination of sexual arousal and sadistic pleasure Aurice derived from beating and abusing Choyce as a child had engendered similar sadistic drives in him.

Dr. White recounted several aspects of Choyce's upbringing that contributed to the development of Choyce's

mental and emotional impairments. Of primary importance was Aurice's unusual brutality toward her sons. She subjected Choyce and his younger brother, Cedric, to very frequent and vicious beatings on a weekly basis that continued until she either became exhausted or was forced to stop by her husband, William Choyce, Sr. If her husband intervened, Aurice would wait until he departed to work on a night shift and then resume the beatings later. Aurice would regularly wait until Choyce was asleep and then pull him out of bed and beat him for something that had happened earlier in the day.

Dr. Tucker explained Aurice would frequently beat Choyce while wearing see-through clothing or in a state of undress. Many of the people Dr. Tucker interviewed described that Aurice derived pleasure from her abuse of Choyce. She would often strip Choyce to his underwear while beating him with a belt. And, starting in his early childhood, Choyce became sexually aroused during his mother's beatings.

Another factor contributing to Choyce's development of sexual sadism was Aurice's openly licentious behavior. She frequently wore revealing outfits that embarrassed Choyce and provoked salacious comment in the neighborhood. In addition, she would sometimes beat her sons while only half-dressed. Aurice also engaged in frequent extra-marital affairs during Choyce's childhood and, starting when he was about five years old, took him along when she went to meet her lovers. In Dr. White's opinion, those experiences made Choyce feel complicit in his mother's betrayal of his beloved father and caused feelings of shame and rage.

Dr. Tucker testified that Choyce suffered "sadistic physical abuse together with a dynamic sexual component" and

11

opined that this led to him conflating "rage and sexuality." He testified that Choyce "struggled" with his feelings, knowing they were bad, as he tended to "see women as whores" that could not to be trusted. Choyce informed Dr. Tucker that he had been seeing prostitutes once or twice a week for decades.

As to the murders, Dr. Tucker understood Choyce's rationalization to be that Bell, Lee, and Beck were not submissive to his dominant male role, which challenged him in some way, and he killed them as "his final way of asserting" control over them. Dr. Tucker diagnosed Choyce with sexual sadism illness, a mental disorder.

Choyce's siblings, Cedric and Sabrina, testified that they loved him. They also testified about being whipped by their mother. Several other family members and family friends also testified on Choyce's behalf.

David Vasquez, a criminal justice consultant and the former warden of San Quentin Prison, described the conditions Choyce would face in prison, and offered his opinion on whether Choyce would pose a significant security risk as a life prisoner. Vasquez, opined that Choyce would "pose no additional problems" if sentenced to a life term.

### 3. People's Rebuttal Evidence

Maureen Garrett, the probation officer assigned to write Choyce's presentence probation report in the Tamisha P. rape case, testified that Choyce showed no remorse as he described his crimes against Cadine W. and Tamisha P. As to Cadine W., Choyce claimed that there was no rape at all and that it was Cadine W. who "got violent" after wanting more money for sex than the twenty dollars he had offered her.

San Joaquin County Sheriff's Lieutenant Joseph Herrera testified concerning his interview with Choyce while he was incarcerated, in which Choyce denied having sex with, or killing, Bell, Lee, or Beck.

Robert Borg, a prison classification and conditions expert, identified areas of disagreement with Vasquez's testimony, such as the frequency of escapes from Level 4 correctional institutions and the precise security features present at various facilities, and explained the conditions Choyce would face in prison.

## II.    GUILT PHASE ISSUES

### A. Asserted Instructional Errors

#### 1. *Failure to Instruct on Voluntary Manslaughter as a Lesser Included Offense*

Choyce requested guilt phase jury instructions on the lesser included offense of voluntary manslaughter based on the theory that if he committed the charged murders, he did so in a heat of passion arising from provocation.  He claims refusing those instructions was error because substantial evidence supported a theory of voluntary manslaughter.  (See *People v. Wickersham* (1982) 32 Cal.3d 307, 324–325 [trial court must instruct on the law relevant to the issues raised by the evidence].)  Because there is no substantial evidence of provocation by any of the victims and because any alleged error was harmless in any event, we reject this claim.

#### a. *Background*

At the close of the guilt phase of trial, defense counsel requested standard instructions on voluntary manslaughter, including CALJIC Nos. 8.40 (Voluntary Manslaughter), 8.42

(Provocation Explained) and 8.44 (Heat of Passion). At the jury instruction conference, the trial court pressed defense counsel to explain how a jury could properly find that any of the charged killings was a manslaughter. Counsel responded that since the prosecution's theory that all the victims were killed while being sexually assaulted required the jury to draw inferences from the circumstantial evidence, Choyce should similarly be entitled to rely on any "reasonable inferences" that supported the defense theory that the killings were manslaughters. When the trial court tried to clarify the defense manslaughter theory, by hypothesizing that such inferences might include the possibilities that Choyce "had sex with [the victims] but [] didn't kill" them, or that each victim attempted to rob appellant first "to support a drug habit," defense counsel agreed that "those are all reasonable inferences." But defense counsel declined to be pinned down to any particular theory, insisting he "should be allowed to open up all of those theories."

The trial court ultimately advised the defense it was inclined to refuse the proposed instructions unless counsel could point to specific facts supporting a finding that any of the killings was voluntary manslaughter. Defense counsel again refused to do so, arguing more generally that the crimes may have involved encounters which began as consensual, commercial interactions, and the jury could reasonably draw inferences supporting a finding that none of the victims were raped, and Choyce was not guilty of murder in any degree. The trial court ultimately refused to give the requested instructions and the only homicide theories on which the jury was instructed were first degree murder, under both felony murder and premeditation and deliberation theories, and second degree murder.

b. *Analysis*

Under the California Constitution's due process clause, a trial court must instruct the jury on a lesser included offense, whether or not the defendant so requests, whenever evidence that the defendant is guilty of only the lesser offense is substantial enough to merit consideration by the jury. (*People v. Halvorsen* (2007) 42 Cal.4th 379, 414, citing *People v. Breverman* (1998) 19 Cal.4th 142, 154–155.) Substantial evidence in this context is that which a reasonable jury could find persuasive. (*Halvorsen,* at p. 414.) In deciding whether there exists sufficient evidence to support a requested instruction, trial courts should resolve all doubts in favor of the accused. (*People v. Tufunga* (1999) 21 Cal.4th 935, 944.) However, speculation is not evidence and will not warrant the giving of an instruction on a lesser included offense. (*People v. Mendoza* (2000) 24 Cal.4th 130, 174; *People v. Wilson* (1992) 3 Cal.4th 926, 942.)

"Manslaughter is the unlawful killing of a human being without malice." (§ 192.) Voluntary manslaughter is that committed "upon a sudden quarrel or heat of passion." (§ 192, subd. (a).) Voluntary manslaughter is considered a lesser, necessarily included, offense of intentional murder. (*People v. Lee* (1999) 20 Cal.4th 47, 59 (*Lee*).) As we have explained, "an intentional killing is reduced to voluntary manslaughter if other evidence negates malice. Malice is presumptively absent when the defendant acts upon a sudden quarrel or heat of passion on sufficient provocation." (*Ibid.,* citing § 192, subd. (a).) Failure to properly instruct on heat of passion, when warranted, also implicates the federal Constitution because evidence of heat of passion bears on the existence of malice aforethought, an

element of the charged offense. (*People v. Schuller* (2023) 15 Cal.5th 237, 243–244, 252, 254, 260, fn. 7.)

"The heat of passion requirement for manslaughter has both an objective and a subjective component." (*People v. Steele* (2002) 27 Cal.4th 1230, 1252, citing *People v. Wickersham* (1982) 32 Cal.3d 307, 326–327.) "The defendant must actually, subjectively, kill under the heat of passion." (*Steele*, at p. 1252.) With respect to the objective component, " 'this heat of passion must be such a passion as would naturally be aroused in the mind of an ordinarily reasonable person under the given facts and circumstances.' " (*Ibid.*) To satisfy this objective standard, " 'the accused's heat of passion must be due to "sufficient provocation," ' " which must come from the victim. (*Id.* at p. 1253.) The provocation which incites the defendant to homicidal conduct in the heat of passion must be caused by the victim or by conduct reasonably believed by the defendant to have been engaged in by the victim. (*People v. Moye* (2009) 47 Cal.4th 537, 549–550.) "Adequate provocation and heat of passion must be affirmatively demonstrated." (*Lee*, *supra*, 20 Cal.4th at p. 60.)

Here, the trial court properly refused to instruct on a theory of voluntary manslaughter because there was no evidence of either an objective act of provocation by the victims or that Choyce was subjectively provoked when the killings occurred. As the trial court correctly found, there was simply no evidentiary support for a heat of passion theory. There was no evidence that Choyce was attacked, or even verbally abused, by his victims, or that Choyce was upset, distraught, hysterical, or otherwise provoked by them. To the contrary, the evidence shows a consistent pattern of Choyce killing vulnerable women, including evidence of restraining them, raping them, and delivering execution-style close range shots to back of the head,

all of which strongly suggest a lengthy period of premeditation and deliberation and a lack of provocation. (See *People v. Miranda* (1987) 44 Cal.3d 57, 87 overruled on other grounds in *People v. Marshall* (1990) 50 Cal.3d 907 [where evidence suggests manner of killing was "conceived in advance" it suggests a "deliberate plan" and not a "rash explosion of violence"]; *People v. Romero* (2008) 44 Cal.4th 386, 401 [where victim was killed by a single gunshot fired from a gun placed against his head, "this execution-style manner of killing supports a finding of premeditation and deliberation when . . . there is no indication of a struggle"]; *People v. Casares* (2016) 62 Cal.4th 808, 825 ["The method by which defendant killed [the victim] (a gunshot to the back of the head at very close range) was sufficiently particular and exacting to support the inference he intentionally killed him according to a preconceived design"].)

Choyce argues that because Yvette R. survived her attack, while Beck, Bell, and Lee did not, this distinction provided evidence that the murder victims must have attacked him, either verbally or physically, prior to their murder. The mere fortuity that one of Choyce's victims lived provides no substantial evidence that the others provoked him. Yvette R.'s testimony proved that Choyce brutally kidnapped, restrained, and sexually assaulted an unarmed and defenseless woman. It provided no evidence that Choyce was reacting to provocation when he killed his other victims.

Choyce also complains that, in refusing to instruct on voluntary manslaughter, the trial court inappropriately engaged in a credibility determination against him. He is correct that a trial court cannot predict which version of competing evidence a jury will find credible and that credibility determinations should not inform the question of whether there

exists substantial evidence in support of a jury instruction. (*People v. Williams* (1992) 4 Cal.4th 354, 364.) However, the trial court made no credibility determination here. The trial court's reference to a lack of evidence was not based upon a resolution of credibility but upon a failure of proof. (*People v. Balderas* (1985) 41 Cal.3d 144, 196 (*Balderas*) [voluntary manslaughter instruction "is not warranted if there is no cognizable evidence on that theory"].) Because there was insufficient evidence to support a voluntary manslaughter instruction, this claim fails.

Finally, as the Attorney General correctly argues, Choyce suffered no harm, even were an instruction of voluntary manslaughter required. (See *People v. Schuller, supra,* 15 Cal.5th at p. 243 [failure to give voluntary manslaughter instructions subject to harmlessness standard of *Chapman v. California* (1967) 386 U.S. 18, 24].) The jury separately found the felony-murder special circumstances true with respect to each count, establishing that the jury also found appellant guilty under a theory of first degree felony murder, a theory which does not require malice. Because malice is not a required element for the first degree felony murder, voluntary manslaughter instructions, even if applicable, would not have affected the outcome. (See *Balderas, supra,* 41 Cal.3d at p. 197 ["neither 'heat of passion' nor provocation can ever reduce a *murder properly based on the felony-murder doctrine* to voluntary manslaughter"]; see also *People v. Gonzalez* (2018) 5 Cal.5th 186, 209 [failure to instruct on lesser included offenses of malice murder was harmless in light of robbery-murder special circumstance finding].) Thus, the failure to instruct on voluntary manslaughter could not have harmed appellant because the jury would "necessarily [have] determined the

killing was first degree murder, not manslaughter, under []
properly given instructions." (*People v. Demetrulias* (2006) 39
Cal.4th 1, 25 (*Demetrulias*).)

### 2. *Lack of Jury Instruction on the Necessity of a Live Victim*

As we have held, the crime of rape requires a live victim;
"the intent to have sexual intercourse with a dead body is
neither rape nor attempted rape." (*People v. Booker* (2011) 51
Cal.4th 141, 179 (*Booker*); *People v. Carpenter* (1997) 15 Cal.4th
312, 391 (*Carpenter*) [rape requires a live victim].) Choyce
argues that the trial court erred in failing to instruct that sexual
intercourse with a dead body does not constitute rape in that
there was no evidence establishing that Beck, Bell, and Lee were
alive at the time that they were sexually assaulted. He seeks
reversal of the three rape-murder special circumstances.
Recognizing that his claim is foreclosed by our decisions in
*Carpenter* and *Booker*, Choyce requests that we reconsider these
decisions. We decline to do so. In addition, we find that the
claim is forfeited, because Choyce never requested an additional
or clarifying instruction in the trial court.

### a. *Legal background*

In *Booker, supra,* 51 Cal.4th at p. 180, another case
involving a rape murder special circumstance, we held that the
trial court did not err in failing to instruct that the victim must
be alive at the time of intercourse. We noted that a trial court
has a duty to instruct on its own initiative on a particular
defense "only if it appears the defendant is relying on such a
defense, or substantial evidence supports the defense and it is
consistent with defendant's theory of the case." (*Id.* at p. 179.)
The sole evidence that the victim in *Booker* was dead at the time

19

of the rape rested on a "a highly charitable interpretation of defendant's statements to the police" as he never directly told police he sexually assaulted the victim only after her death, and defense counsel never argued that theory to the jury. (*Id.* at p. 180.) Because any claim that the victim was not alive at the time of the rape "was neither substantially supported by the evidence nor relied on by defendant at trial" we found no error. (*Ibid.*)

In *Carpenter*, the defendant also claimed error in failing to instruct that the non-consensual intercourse occurred prior to death. (*Carpenter*, *supra*, 15 Cal.4th at p. 391.) We rejected the claim on the ground that the instructions given — that rape requires intercourse "against the will" of the victim "accomplished by means of fear of immediate and unlawful bodily injury to such person" — adequately conveyed this requirement. Reference to the victim's "will" and "fear" necessarily implied that the victim had to be alive. (*Ibid.*) To the extent the defendant in *Carpenter* complained that there was some ambiguity in the legally correct instructions which required a clarifying instruction, we held that the claim was forfeited, explaining that " 'If defendant believed that the instruction was incomplete or needed elaboration, it was his responsibility to request an additional or clarifying instruction.' [Citations.]" (*Id.* at pp. 391–392.)

b. *Analysis*

As an initial matter, Choyce forfeited any claim to additional or clarifying instruction by not requesting them in the trial court. (*Carpenter*, *supra*, 15 Cal.4th at pp. 391–392.) To the extent we may review a defendant's claim despite his failure to preserve the issue (*People v. Rundle* (2008) 43 Cal.4th

76, 149 (*Rundle*); § 1259 ["The appellate court may . . . review any instruction given, . . . even though no objection was made thereto in the lower court, if the substantial rights of the defendant were affected thereby"]), his claim nonetheless fails.

The trial court instructed the jurors on the elements of rape with CALJIC No. 10.00.[4] Choyce's challenge to these instructions fail on two independent grounds. First, there is no substantial evidence in the record that any of his victims were dead at the time appellant sexually assaulted them, nor was there any argument to that effect by defense counsel. To the contrary, defense counsel argued that any sexual contact between Choyce and his victims would have been part of a "business arrangement" with women who were engaged in sex work. Thus, the claim fails because any instruction on the necessity of the victim's being alive during the sexual assaults was not supported by substantial evidence or relied on by Choyce. (*Booker*, *supra*, 51 Cal.4th at p. 180.) Second, the instructions implicitly indicated that the victims needed to be alive. As in *Carpenter*, the instructions given here required the rape be a result of the victim's "fear of immediate and unlawful bodily injury" and explained that rape must be against the "will" of the victim. These instructions adequately convey that the victim must be alive because a dead body can neither have a "will" nor "fear . . . bodily injury." (*Carpenter*, *supra*, 15 Cal.4th

---

[4] The instructions described the elements of rape as: 1. A male and female engaged in an act of sexual intercourse; 2. The two were not married at the time of that act of intercourse; 3. The act of intercourse was against the will of the alleged victim; and 4. The act was accomplished by means of force, violence, duress, menace, or fear of immediate and unlawful bodily injury to the alleged victim.

at p. 391.) While a record in which there was substantial evidence or argument that the victim was dead at the time of intercourse may present a different question (see *People v. Sellers* (1988) 203 Cal.App.3d 1042, 1050 [reversing where defense theory was that intercourse occurred after death, trial court refused defense instructions, and "ruled, as a matter of law, it was irrelevant whether sexual penetration took place before or after the victim was dead"]), Choyce points to no such evidence here. (See *Booker*, *supra*, 51 Cal 4th at p. 180; *Carpenter*, *supra* 15 Cal.4th at p. 391.) Choyce has presented no compelling reason to revisit our prior holdings on this issue. We reject his claim.

### 3. *Failure to Give Preliminary Jury Instructions Adequately Explaining the Presumption of Innocence*

Choyce contends that the standard introductory instruction defining the presumption of innocence given at his trial, CALJIC No. 2.90, was defective in a number of respects. He claims this instruction 1) failed to affirmatively instruct the jury that a defendant has no obligation to present or refute evidence, 2) failed to convey that a conflict of evidence or a lack of evidence could leave jurors with a reasonable doubt, 3) failed to indicate that the presumption of innocence continues throughout trial, 4) failed to define the term "burden" with respect to the prosecution's burden of proof, and 5) failed to adequately define what the prosecution was obligated to prove beyond a reasonable doubt. We reject these claims and affirm our cases holding that the instructions explaining the presumption of innocence are adequate. In addition, to the extent that Choyce argues that specific additional instructions

clarifying the meaning of the existing instructions are required, we hold his claims are forfeited.

As an initial matter, a defendant who does not seek clarifying or amplifying instructions to CALJIC No. 2.90 in the trial court may not complain about the failure to give such instructions on appeal. (*People v. Lucas* (2014) 60 Cal.4th 153, 295 (*Lucas*).) Choyce made no request for additional instructions, despite the trial court twice confirming that it would provide CALJIC No. 2.90. To the extent we may review a defendant's instructional claim despite his failure to preserve the issue (*Rundle, supra*, 43 Cal.4th at p. 149; § 1259), we find Choyce's claims lack merit.

We have held repeatedly that CALJIC No. 2.90 adequately conveys that a defendant is under no obligation to present or refute evidence, that a lack of evidence or a conflict in evidence can lead to a reasonable doubt, and that the term "burden" is not a technical term that requires further definition. (*Lucas, supra*, 60 Cal.4th at pp. 295–296; *People v. Thomas* (2012) 53 Cal.4th 771, 811 (*Thomas*); *People v. Taylor* (2010) 48 Cal.4th 574, 631, fn. 15 (*Taylor*).) To the extent that the term "burden" acquires a technical definition when used in the phrase "burden of proof," the term is already defined in CALJIC No. 2.90 as that establishing proof beyond a reasonable doubt. (*Lucas*, at p. 295.) With respect to Choyce's claim that CALJIC No. 2.90 fails to inform jurors that the presumption of innocence continues throughout trial, we have rejected this claim numerous times. (*Ibid.*; *Thomas, supra*, 53 Cal.4th at p. 811; *Taylor, supra*, 48 Cal.4th at p. 631.) Finally, insofar as Choyce claims that the instruction failed to adequately explain what the prosecution was required to prove beyond a reasonable doubt, the jury was told that the prosecution had the burden to prove Choyce's

identity as the perpetrator as well as each element of the charged crime. Thus, the jury was informed that the prosecution would not meet its burden of proof if evidence was lacking on any of these points. (*Lucas, supra,* 60 Cal.4th at p. 296.) Because we have found no error in the use of CALJIC No. 2.90, Choyce's related federal constitutional claims must also fail.

## B. Challenge to Felony-Murder and Multiple-Murder Special Circumstances

Choyce, acknowledging that this court has repeatedly rejected challenges to the constitutionality of the felony-murder and the multiple-murder special circumstances (see, e.g. *People v. Sapp* (2003) 31 Cal.4th 240, 286–287; *People v. Musselwhite* (1998) 17 Cal.4th 1216, 1265–1266), requests that we reconsider our previous decisions. We decline to do so.

Choyce raises several arguments to the two challenged special circumstances. First, he argues that using felony murder as a death eligibility factor violates the federal Constitution, because that factor (1) fails to narrow the class of murderers eligible for the death penalty, (2) fails to require an intentional killing as a prerequisite for the death penalty, and (3) erodes the relationship between criminal liability and moral culpability. Second, citing *U.S. v. Cheely* (9th Cir. 1994) 36 F.3d 1439), Choyce claims that the multiple-murder special circumstance is unconstitutional because it applies to a broad class of defendants with varying levels of culpability and thus creates a risk of "impermissibly disparate and irrational sentencing" by failing to provide "guidance to the sentencing jury as to how to distinguish among them." (*Id.* at p. 1444.)

We have repeatedly held that the death penalty statute adequately narrows the class of murderers eligible for the death penalty as required by the Eighth Amendment. (See, e.g., *People v. Morrison* (2004) 34 Cal.4th 698, 730.) And we have specifically and repeatedly held that the felony-murder and multiple-murder special circumstances adequately narrow the class of death eligible murderers. (*People v. Myles* (2012) 53 Cal.4th 1181, 1224–1225 [collecting cases].) Nor does our precedent or high court precedent require an intentional killing as a prerequisite to the imposition of the death penalty. (*People v. Jennings* (2010) 50 Cal.4th 616, 649 ["we have held that imposition of the death penalty upon one who lacks the intent to kill is not cruel and unusual punishment in violation of the Eighth Amendment"]; *Tison v. Arizona* (1987) 481 U.S. 137, 156–158 [conduct short of intentional killing may show culpable mental state that justifies death penalty].) The requirements of *Tison*, which we have further refined (see *People v. Banks* (2015) 61 Cal.4th 788 and *People v. Clark* (2016) 63 Cal.4th 522), maintain a proportional relationship between criminality and moral culpability in the application of the felony-murder special circumstance. Choyce provides no compelling reason to revisit any of these holdings.

Choyce's contention that the multiple-murder special circumstance is unconstitutionally overbroad is likewise unpersuasive. He is correct that the commission of multiple murders, though highly aggravated as a general matter, nonetheless encompasses a wide class of defendants with varying levels of culpability. But the class of defendants, those convicted of murdering more than one person, is not unconstitutionally overbroad. To the contrary, as we have explained in rejecting attacks on this special circumstance, it

25

"focuses on a narrow group of killers[.]" (*People v. Lucero* (2000) 23 Cal.4th 692, 740.) "One who is mentally prepared to commit repeated acts of murder, or to commit a murderous act that results in the death of two or more persons, is more dangerous to society and more deserving of the ultimate punishment than one who has killed once." (*Ibid.*) We decline Choyce's invitation to reconsider this settled law.

## III. PENALTY PHASE ISSUES

## A. Prosecutorial Misconduct in the Cross-examination of Defense Expert Witness

Choyce complains that the prosecutor committed misconduct during his cross-examination of a defense expert, psychologist Gretchen White, who testified during the penalty phase regarding Choyce's upbringing and attempted to explain why he developed into a sexual sadist. He argues that the tenor of the prosecutor's cross-examination of Dr. White constituted prosecutorial misconduct. Because the defense never requested any admonition with respect to the alleged misconduct, we find, as Choyce concedes, that this issue is forfeited. Moreover, we hold that the claim also fails on the merits. Although some objections to the cross-examination were sustained, and the prosecutor below admitted that aspects of his cross-examination may have been "inappropriate," his questioning did not rise to the level of rendering Choyce's trial fundamentally unfair, nor did he engage in "deceptive or reprehensible methods to attempt to persuade" the jury or infect the trial with unfairness. (*People v. Young* (2005) 34 Cal.4th 1149, 1184 (*Young*).)

### 1. Factual Background

Dr. White, Choyce's first expert witness, created a psychosocial history for Choyce. On direct examination, Dr.

White testified about information she gathered through interviews with Choyce and his family members and review of his educational records. She described the abuse suffered by Choyce at the hands of his mother and how it affected him. Two significant conclusions reached by Dr. White were that Choyce had "a great deal of rage towards women[,]" and that his ability to attach to other people was "tremendously impaired" because of his relationship with his mother, who had been "very controlling, very brutal, very sexual but completely devoid of affection."

The prosecutor engaged in a vigorous cross-examination of Dr. White. Initiating his questioning by inquiring whether Dr. White's testimony was an attempt to "blame the family" for Choyce's crimes, the prosecutor repeatedly cut her off during questioning without allowing her to answer, leading the court to instruct the prosecutor to allow Dr. White to answer questions. When the prosecutor inquired whether Dr. White had asked Choyce "why he put the gun to the back of Beck's head and shot her[,]" the trial court sustained an objection that the question was argumentative. The prosecutor soon thereafter interposed a similar question, without objection, querying whether Dr. White had asked Choyce why he "put a gun in [Tamisha P.'s] vagina."

The prosecutor also questioned Dr. White's professional integrity, asking whether Dr. White was the "one to go to" when a capital defendant wished to "blame it on the parents." When the prosecutor subsequently asked Dr. White if she "almost always [came] up with" a way to place the blame on the parents when she testified in capital cases, defense counsel objected to the question as argumentative. The trial court overruled defense counsel's objection, but instructed the prosecutor to

change his "tone of voice." The prosecutor continued cross-examining Dr. White on this theme, inquiring whether it was her customary practice to take the kind of dysfunction found in "every family" and "spend 50 grand constructing it into a . . . psychosocial history." He also asked whether her business was based on referrals. After the trial court overruled objections that this second line of questioning was irrelevant and argumentative, the prosecutor inquired "if you do a good job in one case, get the guy off, you're going to get called back to do the same thing in another case." He also asked whether Dr. White taught defense attorneys how to spare defendants' lives and about how "handsomely" she was paid for her work.

When the prosecutor explored Dr. White's diagnoses of other capital defendants, defense counsel objected that the manner of questioning was "demeaning" and the trial court sustained the objection, explaining that the "substance" of the questioning was "fine" but "[i]t's the tone of voice that you're asking it in" that led to the sustained objection. The prosecutor then admitted "I get really emotional about this[.]" Subsequently, the trial court sustained another objection after the prosecutor insinuated that Dr. White had violated her ethical obligations and was not engaging in "fair play" because she did not prepare a report of her findings and conclusions. After this objection was sustained, the prosecutor immediately continued, inquiring whether Dr. White was "trying to hide the ball[,]" a question which led to another sustained objection on argumentativeness grounds.

After redirect examination, defense counsel spoke to the trial court, protesting the prosecutor's lack of decorum in cross-examining Dr. White, in particular his use of "demeaning tones and attitudes," and the trial court's alleged failure to control

that behavior. The trial court responded by explaining that it had sustained multiple objections made on argumentative grounds by defense counsel. The prosecutor then admitted that he had "raised [his] voice probably inappropriately. I caught myself, and I believe I was much more level-headed after that initial outburst, which I think was more nerves than anything else." Defense counsel responded that a properly rigorous examination did not include "being demeaning" "rude," or "yelling." Counsel also complained that the prosecutor had mistitled Dr. White, addressing her as Ms. White, rather than with her correct title. The trial court noted that "those points are very well taken when [the prosecutor] did not refer to her as a doctor." However, the trial court noted that while the prosecutor used an "objectionable" tone of voice in examining Dr. White, he did not "yell" at her. Defense counsel did not request further admonition to the jury or any other remedy.

### 2. Analysis

As an initial matter, many of Choyce's claims are forfeited for failing to timely object on prosecutorial misconduct grounds, and all are forfeited by failure to request an admonition. (*People v. Hill* (1998) 17 Cal.4th 800, 820 [the general rule is that defendant may not complain on appeal of prosecutorial misconduct unless in a timely fashion — and on the same ground — the defendant made an assignment of misconduct and requested that the jury be admonished to disregard the impropriety].) The defense did not object to, and thus forfeited, claims relating to the prosecutor's questions about whether Dr. White 1) had asked Choyce whether he put a gun in Tamisha P.'s vagina, 2) was the expert "to go to when you want to blame it on the parents," 3) if she focused on "the dysfunction" that exists "in every single family" and "blow it up" by spending "50

grand" to construct a psychosocial history, and 4) whether she had been paid "handsomely" to instruct defense attorneys how to spare their clients' lives.[5]  Nor did the defense request any admonition beyond those already given by the trial court.  While Choyce offered several successful evidentiary objections to many of the complained-of incidents, "[t]o preserve such a claim for appeal, the ' "defendant must make a timely and specific objection *and* ask the trial court to admonish the jury to disregard the improper argument." ' "  (*People v. Ghobrial* (2018)

---

[5]     The Attorney General additionally claims that Choyce forfeited his objection to the prosecutor's insinuation that Dr. White violated her ethical duties by not writing a report. However, the prosecutor's initial questioning merely explored whether such an ethical duty existed, and it was not until the prosecutor directly assumed during questioning that Dr. White was not engaging in "fair play" and was attempting to "hide the ball" by not preparing a report that the remarks drew repeated, and sustained, objections.  The prosecutor's improper argument on this point constituted a single line of questioning and does not require objection for each specific subpart, particularly where objection to the initial questioning would likely have not been sustained.  (Cf. *People v. Seumanu* (2015) 61 Cal.4th 1293, 1341 (*Seumanu*) [failure to object may be excused "due to the incremental nature of the improper argument"].)  As we detailed in *Seumanu*, the "incremental nature" of improper argument will only on "rare" occasions *entirely* excuse an objection, and only then when a later objection to the "clinching" remark has become futile due to the harm already inflicted by the prior remarks.  (*Id.* at pp. 1339–1342.)  But here, unlike in *Seumanu*, counsel *did* ultimately object when the questioning became improper.    In  such  an  instance,  the  reviewing  court appropriately reviews the totality of the line of questioning for its prejudicial impact.  (*People v. Alfaro* (2007) 41 Cal.4th 1277, 1329 (*Alfaro*) [where objections are ultimately sustained, reviewing court considers prejudicial impact of "lines of questioning"].)

5 Cal.5th 250, 289–290 (*Ghobrial*), italics added.) Choyce concedes that his claim is forfeited and that, under existing precedent, no exception to his forfeiture applies.

In his reply brief, Choyce reiterates this concession. However, he also attempts to limit it, asserting that the "series of foul blows" the prosecutor struck in an attempt to undermine Dr. White's credibility rendered the penalty trial unfair, and thus violated the federal and state constitutions in a manner that he cannot forfeit. This argument is not well taken. As Choyce has conceded, this case is not among those "extreme cases," such as *Hill,* where the prosecutor engaged in pervasive misconduct during the trial, defense counsel made repeated unsuccessful attempts to curb that misconduct, and a poisonous atmosphere in the courtroom made further applications to the trial court futile. We reject Choyce's invitation to reconsider *Hill*, an argument which is raised for the first time in the reply and is thus forfeited. (*People v. Duff* (2014) 58 Cal.4th 527, 550, fn. 9.) Because Choyce did not request any admonition or other remedy to cure the allegations of prosecutorial misconduct, the entire claim is forfeited.

Choyce's claims of prosecutorial misconduct also fail on the merits. "A prosecutor's conduct violates the Fourteenth Amendment to the federal Constitution when it infects the trial with such unfairness as to make the conviction a denial of due process." (*People v. Morales* (2001) 25 Cal.4th 34, 44.) In other words, the misconduct or error must be "of sufficient significance to result in the denial of the defendant's right to a fair trial." (*People v. Cole* (2004) 33 Cal.4th 1158, 1202, quoting *United States v. Agurs* (1976) 427 U.S. 97, 108.) The standard for reversal on grounds of prosecutorial misconduct is lower under state law; even if the misconduct is not so egregious as to render

the trial fundamentally unfair, reversal is required if the prosecutor used "deceptive or reprehensible methods to attempt to persuade either the court or the jury" that are reasonably likely to have affected the outcome of the proceeding. (*People v. Cash* (2002) 28 Cal.4th 703, 733; see *People v. Ramirez* (2022) 13 Cal.5th 997, 1129; *People v. Tate* (2010) 49 Cal.4th 635, 706.)

Choyce fails to satisfy either standard. As to several of the complained-of incidents, objections were, appropriately, sustained. (See *Alfaro, supra,* 41 Cal.4th at p. 1329 ["the trial court sustained defendant's objections to both lines of questioning, thereby limiting the possible prejudicial effect of the prosecutor's questions and comments"]; *People v. Dykes* (2009) 46 Cal.4th 731, 764 [because the trial court sustained objections, court assumed prejudice was abated].) As to the remaining complaints regarding improper questioning, many of the subjects explored during cross-examination were valid.

For instance, there was nothing improper in inquiring about Dr. White's financial incentives in testifying. (*People v. Salcido* (2008) 44 Cal.4th 93, 154 (*Salcido*) ["prosecutor has considerable leeway in suggesting an expert may testify a certain way for financial gain or other reasons, without committing misconduct"].) Nor was it misconduct to characterize Dr. White's testimony as an attempt to "blame the parents." (See *People v. Krebs* (2019) 8 Cal.5th 265, 342 ["the prosecutor's use of pungent language, calling defense strategy a 'blame game,' 'guilt trip,' or 'abuse excuse,' does not rise to the level of misconduct"].) And parties are entitled to inquire about the nature of an expert's testimony in prior cases involving similar issues, including an "attempt to refresh the witness's recollection of these other cases by providing a brief recitation of their salient facts." (*People v. Shazier* (2014) 60 Cal.4th 109,

137; *People v. Zambrano* (2007) 41 Cal.4th 1082, 1165 ["The prosecutor was entitled to expose bias in the witness by showing his propensity to advocate for criminal defendants even in extreme cases"]; *People v. Steskal* (2021) 11 Cal.5th 332, 359 [" '[a]n expert's testimony in prior cases involving similar issues is a legitimate subject of cross-examination when it is relevant to the bias of the witness.' "].)

We agree with Choyce, and the trial court, that the prosecutor should not have mistitled Dr. White, repeatedly referring to her instead as "Ms. White," in a disrespectful manner.[6]  Choyce notes that counsel did not engage in the same behavior towards a male expert called by the defense. However, this expert testified only after the prosecutor had been admonished to use correct titles.  Notwithstanding the impropriety of the prosecutor's mistitling of Dr. White, defense counsel failed to contemporaneously object to these remarks. Moreover, although the defense raised the issue during a subsequent hearing, defense counsel never requested an admonition to the jury to disregard them, or any other curative admonition.  This particular claim of misconduct is therefore forfeited.  (*Ghobrial*, *supra*, 5 Cal.5th at pp. 289–290.)

---

[6]    During a prior point in the proceedings, outside the presence of the jury, the prosecutor also referred to Dr. White as the "gal that did the history" and was asked by defense counsel to refer to the defense expert as "Dr. White."  Later, on the third occasion he mistitled Dr. White, the prosecutor was again corrected by defense counsel during cross-examination, though without formal objection.  We do not condone these remarks. But on the facts of this case, any complaints regarding these particular inappropriate remarks towards Dr. White are forfeited because Choyce did not contemporaneously object or seek a curative admonition.

With respect to the remaining complained-of questioning, the prosecutor did not engage in "deceptive or reprehensible methods to attempt to persuade" the jury or infect the trial with unfairness. (*Young, supra,* 34 Cal.4th at p. 1184.)

In the abstract, there is nothing improper about pointed challenges to a defense witness's credibility. We have said that "[a]lthough prosecutorial arguments may not denigrate opposing *counsel's* integrity, 'harsh and colorful attacks on the credibility of opposing *witnesses* are permissible.' [Citations.]" (*People v. Parson* (2008) 44 Cal.4th 332, 360.) Nonetheless, argumentative questions and sarcastic comments may at least contribute to prosecutorial misconduct in conjunction with other inappropriate conduct. (E.g., *People v. Wallace* (2008) 44 Cal.4th 1032, 1071 [prosecutor committed misconduct by violating a court order limiting references to a report, asking argumentative questions, and "improperly comment[ing] on defendant's answers with phrases such as 'Really' or 'I see' "].) It may also be improper for a prosecutor to imply an expert is biased for no more than sharing her expertise at a criminal defense conference or to suggest without foundation that an expert conspired with the defense to withhold evidence from the prosecution. (Cf. *People v. Steskal, supra,* 11 Cal.5th at p. 359 [assuming for the sake of argument that it was improper to allow cross-examination implying bias from the expert's willingness to testify for the defense]; *People v. Krebs, supra,* 8 Cal.5th at p. 343 [a prosecutor " 'is not permitted to make false or unsubstantiated accusations that counsel is fabricating a defense or deceiving the jury' "].)

The prosecutor's comments here were, for the most part, argumentative questions to which several objections were, appropriately, sustained. Nor was the overall pattern one which

demonstrated "deceptive or reprehensible methods to attempt to persuade" the jury or infect the trial with unfairness. (*Young, supra,* 34 Cal.4th at p. 1184.) We therefore reject Choyce's claim of prosecutorial misconduct on the merits.

Even setting aside forfeiture, and assuming for the sake of argument that some misconduct occurred, any assumed misconduct was harmless. The trial court sustained several objections to argumentative questioning. (*Alfaro, supra,* 41 Cal.4th at p. 1329 [sustained objections reduce prejudicial impact to alleged misconduct].) The trial court not only sustained objections to the form and tone of questioning and to some questions about Dr. White's veracity, but the prosecutor acknowledged in front of the jury that the expert should disregard the prosecutor's raised voice. And the bulk of cross-examination focused on proper topics regarding Dr. White's prior work, and her methods and conclusions in Choyce's case, so any inappropriate conduct was "minor in light of the [penalty] trial as a whole." (*People v. Sanchez* (2016) 63 Cal.4th 411, 475.)

Moreover, the three murders involved the abduction and rape of vulnerable women and were particularly heinous. As Choyce himself acknowledges, the mitigation strategy — that Choyce's childhood experiences "made him into the kind of 'guy who kills women and . . . has very angry, sadistic feelings towards' them" — carried a "high risk" of alienating the jury. Aside from Dr. White's testimony about his childhood experiences, a second expert testified that Choyce became sexually aroused by humiliating and causing others to suffer and confirmed disparaging statements Choyce made about his victims. In aggravation, the prosecution presented additional detailed instances of Choyce raping and assaulting sex workers. In this context, the prosecutor's cross-examination did not make

the penalty phase so unfair as to violate due process and there is no reasonable possibility it affected the penalty outcome. (*Morales,* supra, 25 Cal.4th at p. 44; *People v. Brown* (1988) 46 Cal.3d 432, 446–448.)

## B. Asserted Instructional Errors

### 1. Error in Failing to Redefine Reasonable Doubt in the Penalty Phase

We have repeatedly held that, where the trial court instructs the jury during the penalty phase to ignore the instructions from the guilt phase, it is error to fail to redefine reasonable doubt during the penalty phase. (*People v. Holt* (1997) 15 Cal.4th 619, 685 [error not to redefine reasonable doubt at the penalty phase after instructing jurors to ignore the guilt phase instructions]; *People v. Cowan* (2010) 50 Cal.4th 401, 494 [same]; *People v. Chatman* (2006) 38 Cal.4th 344, 408 [same]; *People v. Lewis* (2008) 43 Cal.4th 415, 535 [same].) Choyce asserts that the trial court failed to reinstruct in this case after informing the jury to disregard the guilt phase instructions, an error which the Attorney General concedes.

Nonetheless, as the Attorney General correctly notes, a trial court's failure to redefine reasonable doubt at the penalty phase after instructing the jury to disregard the guilt-phase instructions (see CALJIC No. 8.84.1) is harmless when, as here, the jury has no reason to believe that reasonable doubt might be defined in any way other than the definition it received at the guilt phase. (*People v. Lopez* (2013) 56 Cal.4th 1028, 1081–1082; *People v. Boyce* (2014) 59 Cal.4th 672, 716–717.) As Choyce concedes, there is nothing in the record to suggest that the jury applied an incorrect or inconsistent legal standard as a result of the failure to reinstruct on reasonable doubt. Because he

provides no compelling reason to revisit our established law on this point, we conclude that this error was harmless.

### 2. *Inadequate Response to Jury Question About the Meaning of Life Without Parole*

During penalty deliberations, the jury requested clarification regarding the effect of a life without parole verdict. The jury's note asked whether, if Choyce were sentenced to life without the possibility of parole, there existed "any chance that he would ever get out (be paroled) released for any reason." The defense recommended that the jury's question be answered directly in the negative. Instead, the trial court instructed the jury to review the language in its modified version of CALJIC No. 8.84, which informed the jury that it must "assume that the penalty that they impose . . . will be carried out." Choyce contends the trial court's response to the jury's question failed to adequately inform the jury of his parole ineligibility in violation of due process pursuant to *Simmons v. South Carolina* (1994) 512 U.S. 154, in addition to violating the Sixth, Eighth, and Fourteenth Amendments to the federal Constitution. We find no error.

#### a. *Background*

During the first day of penalty phase deliberations, the jury sent out a note with the question: "If the defendant gets life without the possibility of parole, is there any chance that he would ever get out (be paroled) released for any reason[?]"

During subsequent discussion with the parties, the court indicated that it was inclined to refer the jury to lines 11 and 12 of the modified version of CALJIC No. 8.84 that was given at trial, which instructed the jury that "In making your decision about penalty, you must assume that the penalty you impose,

death or life without the possibility of parole, will be carried out." Defense counsel warned that the jury's question may have related to an oblique reference by a prosecution prison expert about the possibility of release, through gubernatorial commutation, of prisoners serving a sentence of life without the possibility of parole. Counsel argued that the jury's question therefore demanded something "stronger" and "calls for a direct answer" and that the "direct answer would be no, he's never going to be released."

The prosecutor disagreed, citing our decision in *People v. Snow* (2003) 30 Cal.4th 43 (*Snow*), which held that "when the jury expresses a concern regarding the effect of a life without parole sentence, the court should instruct the jury 'to *assume* that whatever penalty it selects will be carried out' or give 'a comparable instruction.' [Citation]." (*Id.* at p. 123, italics in original.) The trial court declined Choyce's invitation and referred the jury to the modified version of CALJIC No. 8.84 quoted above.

b. *Analysis*

We have repeatedly held that CALJIC No. 8.84, by explicitly referencing a sentence of "life without the possibility of parole," "adequately informs the jury 'of the defendant's ineligibility for parole.'" (*People v. Prieto* (2003) 30 Cal.4th 226, 270.) Choyce primarily contends that, due to the uncertainty about the effect of a life verdict reflected in the jury's question, the responsive instruction was insufficient because the jury in this case was "never informed that if they rejected a death sentence appellant would never be released on parole." However, as we have held, because of the possibility of gubernatorial commutation or pardon, it would be inaccurate

and therefore erroneous to instruct the jury that appellant could "never" be released on parole. (*People v. DePriest* (2007) 42 Cal.4th 1, 58.) Thus, though some jurors may "may seek an assurance that there are no circumstances under which a sentence of life without possibility of parole could be altered to permit parole" trial courts "cannot provide such an assurance." (*People v. Perry* (2006) 38 Cal.4th 302, 321 (*Perry*).)

Choyce also complains that the term "life without the possibility of parole" is unclear to juries generally, and to this jury in particular, as reflected in its question. Not so. We have repeatedly held that the term "life without the possibility of parole" is self-explanatory and requires no further elaboration due to an alleged misconception held by jurors generally. (*People v. Kipp* (1998) 18 Cal.4th 349, 378; *Perry*, *supra*, 38 Cal.4th at p. 321 ["The phrase 'without possibility of parole' is clear and on its face absolutely bars parole"].) That Choyce's jury wondered whether there was a chance of parole, notwithstanding the term's plain meaning, is not evidence that the term itself is confusing.

The question remains as to whether the trial court appropriately responded to the jury's question. The governing law at the time of trial, as we held in *Snow*, was that when a penalty phase jury expresses concern regarding the effect of a verdict of life without the possibility of parole, the trial court should instruct the jury " 'to *assume* that whatever penalty it selects will be carried out' " or give " 'a comparable instruction.' " (*Snow*, *supra*, 30 Cal.4th at p. 123, italics in original.) Subsequently, however, in *People v. Letner and Tobin* (2010) 50 Cal.4th 99 (*Letner*), we disapproved of such an instruction, due to its misleading nature. Our concern was that "a presumption or assumption that the sentence will be carried out is, in fact,

contradicted by the real possibility, of which some jurors may be aware, that the sentence will not be carried out." (*Id.* at p. 206.) Accordingly, if the jury directly raises the prospect of commutation, the "trial court must make ' "a short statement indicating that the Governor's commutation power applies to both [death and life without possibility of parole] but emphasizing that it would be a violation of the juror's duty to consider the possibility of such commutation in determining the appropriate sentence." ' " (*People v. Nguyen* (2015) 61 Cal.4th 1015, 1084 (*Nguyen*), citing *Letner*, at pp. 203–204; see also *People v. Ramos* (1984) 37 Cal.3d 136, 159, fn. 12; *People v. Samuels* (2005) 36 Cal.4th 96, 138 (conc. opn. of Werdegar, J.).) More broadly, we suggested an appropriate instruction regarding the meaning and effect of the jury's verdict generally would be "[i]t is your responsibility to decide which penalty is appropriate in this case. You must base your decision upon the evidence you have heard in court, informed by the instructions I have given you. You must not be influenced by speculation or by any considerations other than those upon which I have instructed you." (*Letner*, at p. 206.) Although the trial court applied controlling law at the time of trial, we are constrained to find that its reliance on the very instruction we have since disapproved in *Letner* was error. The error, however, was harmless.

We recognize that "a mistaken belief that the alternative to death is more lenient than the law actually provides may improperly bias that juror's penalty determination in favor of death." (*Nguyen, supra,* 61 Cal.4th at p. 1084.) But the nature of the error here is not that the jury was unaware of Choyce's parole ineligibility, which the instructions already properly conveyed. It is instead the harm flowing from providing an

instruction that we have disapproved as a method to cure the potential harm:  that jury here may have improperly speculated about matters outside its purview.

Notably, Choyce does not directly challenge the propriety of the *Snow* instruction in light of its disapproval in *Letner*.  He requested a different instruction entirely, that Choyce could never be released on parole, which is an instruction that we have never approved.  If anything, the use of an outdated instruction — that the jurors should assume that the sentence of life without the possibility of parole would be carried out — would seem more favorable to him than the more generic *Letner* instruction.

*Letner*'s disapproval of the instruction provided here was founded primarily on our concern that the instruction contradicted reality:  the "real possibility, of which some jurors may be aware, that the sentence will not be carried out." (*Letner*, *supra*, 50 Cal.4th at p. 206.)  Instructing jurors to assume results which are likely not true is self-contradictory, and self-contradictory instructions risk confusing the jury, being ignored, and corroding the jury's decisionmaking process.  (Cf. *Penry v. Johnson* (2001) 532 U.S. 782, 799 [curative special instruction in capital case which contradicted and nullified other instructions made "the jury charge as a whole internally contradictory, and placed law-abiding jurors in an impossible situation"].)

However, *Letner*'s concern did not lie equally on both sides of the jury's verdict in capital cases in California.  The "very real" possibility that the sentence would not be effectuated referenced in *Letner* acknowledged the current delays and dysfunction of the California death penalty and their impacts of

41

the effectuation of death sentences (of which many members of public are aware). It did not presume as a "very real" possibility the extraordinarily remote chance that a future governor would commute the life sentence of an individual convicted of serial rape and murder as Choyce was here. Thus, we expect that there was no cognitive dissonance introduced by instructing Choyce's jurors, as we had previously condoned (*Snow*, *supra*, 30 Cal.4th at p. 123), to assume that a sentence of life without the possibility of parole would be carried out.

We are also unconvinced that the trial court's response was reasonably likely to mislead the jury to Choyce's detriment. The response clearly intended to disabuse the jury of the notion that it should consider the speculative possibility that a defendant might be released notwithstanding a sentence of life without the possibility of parole. The trial court explicitly instructed the jury to assume the sentence of life without the possibility of parole would be carried out, and we presume this removed from the jury's deliberations any improper consideration of parole for a parole ineligible sentence.

In cases where "potentially misleading instructions have been given" the reviewing court "examine[s] the entire record, focusing particularly on the arguments of counsel and any other relevant instructions, to determine whether the jury may have been misled[.]" (*People v. Crandell* (1988) 46 Cal.3d 833, 883.) Although *Letner* subsequently recognized the instruction given here as misleading, and cautioned against its future use, nowhere in the instructions or in argument was there any suggestion that Choyce would ever be released or that commutation was likely. Even the brief reference by the prosecution expert, cited by defense counsel during discussions on the proper response to the jury's question, did not indicate

that any capital defendant sentenced to life without the possibility of parole in California had ever had their sentence commuted, resulting in parole. To the contrary, the expert indicated that he did not "know of any" such cases. Therefore, in the absence of any substantial suggestion that the sentence would not be carried out, we find any error in providing the disapproved instruction harmless. (See *People v. Harris* (2008) 43 Cal.4th 1269, 1318 [no prejudice for failure to provide further instruction on meaning of life without the possibility of parole where the court "informed the jury in so many words to consult the instructions it was given, without looking for further definition"]; see also *People v. Ghent* (1987) 43 Cal.3d 739, 770 ["brief and isolated voir dire references" to possible commutation or clemency do not constitute reversible error].)

## C. Delay Between Death Sentence and Execution

Choyce notes that he has been in custody under sentence of death since December 15, 2008, a period of over 16 years. He argues that to execute him after such a lengthy confinement would violate the Eighth Amendment and various other provisions of the federal Constitution and their state analogues, including the prohibition of cruel or unusual punishment under article I, section 17 of the California Constitution. This claim, often referred to as a "*Lackey* claim" which "takes its name from a memorandum opinion on denial of certiorari by Justice John Paul Stevens in *Lackey v. Texas* (1995) 514 U.S. 1045" has been raised in this court before. (*Seumanu, supra,* 61 Cal.4th at p. 1370.)

This Court has repeatedly rejected *Lackey* claims. (See *People v. Charles* (2015) 61 Cal.4th 308, 336 ["We have consistently rejected this claim and see no reason to reconsider

our earlier precedents"]; *People v. Vines* (2011) 51 Cal.4th 830, 892; *Salcido, supra,* 44 Cal.4th at p. 166; *People v. Ward* (2005) 36 Cal.4th 186, 222; *People v. Brown* (2004) 33 Cal.4th 382, 404; *People v. Lenart* (2004) 32 Cal.4th 1107, 1131.) As we have explained, " '[o]ne under judgment of death does not suffer cruel and unusual punishment by the inherent delays in resolving his appeal. If the appeal results in reversal of the death judgment, he has suffered no conceivable prejudice, while, if the judgment is affirmed, the delay has prolonged his life.' " (*People v. Richardson* (2008) 43 Cal.4th 959, 1037.) Choyce provides no compelling reason to revisit these established precedents. Accordingly, we reject this argument.

## D. Introduction of Victim Impact Evidence

Prior to the penalty phase, Choyce moved to exclude and/or limit the admission of victim impact evidence during the prosecution's penalty phase presentation. The trial court denied the motion. Choyce now claims that the trial court erred. We reject this claim.

### 1. Background

Before the commencement of the penalty phase, Choyce moved to exclude and/or limit victim impact evidence. Specifically, the motion sought to (1) limit the evidence solely to testimony by adult relatives of the victims who were present during or immediately after the crime; (2) exclude any evidence about the impact of the crimes, including facts about the victims, that appellant did not know and could not have reasonably foreseen; (3) exclude unduly emotional victim impact testimony; and (4) exclude all evidence about the impact of offenses other than the three counts of capital murder. Instead of granting these blanket limitations, the trial court instructed the

prosecutor to present a written offer of proof and the court would then decide if an Evidence Code section 402 hearing was necessary for particular evidence. Subsequently, the trial court determined that an Evidence Code section 402 hearing was unnecessary because the prosecutor had also provided a list of questions to be presented to the victim impact witnesses so that there would be no "mystery" in the testimony.

At the penalty phase, the prosecutor called 15 witnesses to testify regarding victim impact of the capital crimes: eight of Lee's family members; two of Bell's family members; and five of Beck's family members. In addition, the prosecutor called Yvette R., one of Choyce's rape victims, who explained that she turned to drugs to numb the pain of the crime, had attempted suicide, and even more than a decade after the rape, still had nightmares about it. Cynthia R., Yvette R.'s daughter, testified about the impact of the crime on her mother, how rape played "a big role in why [Yvette R.] went on drugs" and that she lost her children "behind the drugs."

### 2. Analysis

The Eighth Amendment permits the admission of evidence showing how a defendant's capital crimes directly impacted the victim's family members unless such evidence is "so unduly prejudicial" that it results in a trial that is "fundamentally unfair." (*Payne* v. *Tennessee* (1991) 501 U.S. 808, 825; *People v. Simon* (2016) 1 Cal.5th 98, 138 (*Simon*).) The victim impact evidence here was neither unduly prejudicial nor so inflammatory that it rendered the proceeding fundamentally unfair. Rather, the victim impact evidence introduced in this case was illustrative of the harm caused by Choyce's murders of Bell, Lee, and Beck and his violent disregard for women from

other criminal activity introduced under section 190.3, factors (b) and (c). The family members who testified properly described the nature of their relationships with the victims, how they learned about the crimes, and how the crimes impacted their lives.

Echoing the arguments below, Choyce asserts the trial court should have limited the victim impact evidence to a single witness per murdered victim. Further, he argues that only witnesses who were present at the scene or arrived immediately after the crime should have been allowed to testify, and that all victim impact witnesses should have been limited to testifying about the effects of the murder that were known or reasonably apparent to Choyce at the time of the crime. As Choyce acknowledges, we have rejected such arguments in the past.

We have imposed no specific limit on the number of victim impact witnesses who can be called during a penalty phase. (*People v. Trinh* (2014) 59 Cal.4th 216, 245, citing *People v. Montes* (2014) 58 Cal.4th 809, 883–884 [victim impact testimony need not be limited to a single witness]; *People v. McKinnon* (2011) 52 Cal.4th 610, 690 [same].) Instead, we have explained that "[t]he number of witnesses sufficient to accurately portray the effects of a defendant's actions will vary from case to case, and the trial court is vested with discretion to control any excesses by excluding cumulative as well as irrelevant testimony." (*Trinh*, at p. 246.) Aside from seeking to impose a numerical limit, a rule which we again reject, Choyce has provided no argument that the trial court abused its discretion in this case.

Nor have we required that victim impact evidence be limited to the testimony of witnesses who were present at the

scene during or immediately after the crime, or that the testimony concern only those effects of the murder that were either known or reasonably apparent to the defendant at the time of the crimes. (*People v. Blacksher* (2011) 52 Cal.4th 769, 841; *People v. Brady* (2010) 50 Cal.4th 547, 578.) Choyce cites to language in Justice Kennard's concurring and dissenting opinion in *People v. Fierro* (1991) 1 Cal.4th 173, which proposed limiting victim impact testimony to information that was "reasonably apparent to the defendant" at the time of the capital offense. (*Id.* at pp. 259, 264–265.) We have repeatedly declined to adopt that language, and Choyce provides no persuasive reason to reopen our consideration of these issues. (See, e.g., *People v. Schultz* (2020) 10 Cal.5th 623, 679; *Simon, supra,* 1 Cal.5th at pp. 140–141; *People v. Jones* (2012) 54 Cal.4th 1, 70; *People v. Myles* (2012) 53 Cal.4th 1181, 1219.)

As we held in *People v. Hartsch* (2010) 49 Cal.4th 472, under our existing cases it is "manifestly meritless" to claim that victim impact evidence should be strictly limited in every case to one witness per victim, describe only the effects of the crime on a family member present at the murder scene, and include only those effects known or reasonably apparent to the defendant when he committed the crimes. (*Id.* at pp. 508–509.) Choyce provides no persuasive reason to reconsider our prior holdings.

Choyce also complains regarding the victim impact testimony regarding the sexual assault of Yvette R., which consisted of testimony from Yvette R. as well as her daughter, Cynthia R. He urges us to reconsider our cases holding that it is permissible to admit at the penalty phase victim impact evidence regarding uncharged violent crimes admitted under section 190.3, factor (b). (See, e.g., *People v. Virgil* (2011) 51

Cal.4th 1210, 1276; *People v. Bramit* (2009) 46 Cal.4th 1221, 1241; *People v. Davis* (2009) 46 Cal.4th 539, 617; *Demetrulias, supra,* 39 Cal.4th at p. 39.) Although the testimony of Yvette R. and her daughter, Cynthia R. related to *charged* (albeit noncapital) crimes, we have held that a surviving victim's testimony regarding the "emotional impact" of charged crimes can be admissible under section 190.3, factor (b). (*People v. Scully* (2021) 11 Cal.5th 542, 606.) Under this rule, we have repeatedly sanctioned victim impact testimony from surviving victims of capital defendants' sexual assaults. (*People v. Miles* (2020) 9 Cal.5th 513, 528; *People v. Martinez* (2010) 47 Cal.4th 911, 961.) Choyce offers no persuasive reason to reconsider the admissibility of Yvette R.'s testimony. And even assuming the testimony from her daughter (who was not herself a victim of the crime) was improper, its introduction was harmless. Yvette R. had already presented the jury with powerful testimony regarding the enduring emotional impact of Choyce's sexual assault from a first-person perspective. Moreover, the jury was also presented with evidence concerning three other rapes, each of which ended in homicide, as well as abundant testimony regarding the emotional impacts of these crimes. In light of the wealth of evidence regarding the emotional impacts of Choyce's crimes on victims and their family members, there is no reasonable possibility that excluding Cynthia R.'s testimony would have affected the jury's decision to sentence defendant to death. (*Brown, supra*, 46 Cal.3d at p. 448; *People v. Johnson* (2016) 62 Cal.4th 600, 665 (conc. opn. of Cuellar, J.).)

### E. Miscellaneous Challenges to the Death Penalty

Choyce presents many challenges to the constitutionality of California's death penalty scheme. He acknowledges that we

have rejected them before, and we decline to revisit the following precedent:

"The death penalty statute as construed by this court does not fail to perform the narrowing function required by the Eighth Amendment." (*People v. Suarez* (2020) 10 Cal.5th 116, 190.)

"Consideration of the circumstances of the crime during the penalty phase pursuant to section 190.3, factor (a), does not result in an arbitrary and capricious application of the death penalty and does not violate the Fifth, Sixth, Eighth, and Fourteenth Amendments to the federal Constitution." (*People v. Mitchell* (2019) 7 Cal.5th 561, 587 (*Mitchell*).)

"The jury need not make findings beyond a reasonable doubt that aggravating factors . . . outweighed the mitigating factors . . ." (*Mitchell*, *supra*, 7 Cal.5th at p. 588.) This is so even after *Apprendi v. New Jersey* (2000) 530 U.S. 466; *Ring v. Arizona* (2002) 536 U.S. 584; *Hurst v. Florida* (2016) 577 U.S. 92; and *People v. Henriquez* (2017) 4 Cal.5th 1, 45.

"The death penalty law is not unconstitutional for failing to impose a burden of proof — whether beyond a reasonable doubt or by a preponderance of the evidence — as to the existence of aggravating circumstances, the greater weight of aggravating circumstances over mitigating circumstances, or the appropriateness of a death sentence. [Citation.]" (*People v. Thornton* (2007) 41 Cal.4th 391, 469). Nor is the death penalty law and instructions constitutionally infirm "for failing to inform the jury that there was no burden of proof." (*People v. Gonzales* (2012) 54 Cal.4th 1234, 1299 (*Gonzales*).) "[N]either the cruel and unusual punishment clause of the Eighth Amendment, nor the due process clause of the Fourteenth

Amendment, requires a jury to find beyond a reasonable doubt that aggravating circumstances exist or that aggravating circumstances outweigh mitigating circumstances or that death is the appropriate penalty." (*People v. Blair* (2005) 36 Cal.4th 686, 753, rejected on other grounds in *People v. Black* (2014) 58 Cal.4th 912, 919–920.)

There is no constitutional defect "for failing to require unanimity as to the applicable aggravating factors. [Citation.]" (*People v. Elliot* (2005) 37 Cal.4th 453, 487.)

Existing instructions are "not impermissibly broad or vague in directing jurors to determine whether the aggravating factors were 'so substantial in comparison with the mitigating factors that it warrants death instead of life without parole.' " (*People v. Valdez* (2012) 55 Cal.4th 82, 180, citing *People v. Carter* (2003) 30 Cal.4th 1166, 1226.)

"CALJIC No. 8.88 [the analogue to CALCRIM No. 766] does not improperly fail to inform the jury that the central determination is whether death is the 'appropriate punishment.' The instruction properly explains to the jury that it may return a death verdict if the aggravating evidence 'warrants' death." (*People v. McDowell* (2012) 54 Cal.4th 395, 444 (*McDowell*).)

The federal Constitution does not compel a trial court "to instruct on a 'presumption of life.' " (*Gonzales*, *supra*, 54 Cal.4th at p. 1299.)

There is no constitutional requirement that the sentencing jury be able to consider, as a mitigating factor, the impact of the death sentence on the defendant's family. (*People v. Williams* (2013) 56 Cal.4th 165, 197–198.)

There is no constitutional requirement that the jury file written findings as to which aggravating factors it relied on in

imposing the death penalty. (*People v. Rangel* (2016) 62 Cal.4th 1192, 1235 (*Rangel*).)

"The trial court is not required to delete inapplicable sentencing factors from [CALCRIM No. 763 (the analogue to CALJIC No. 8.85)]." (*McDowell, supra,* 54 Cal.4th at p. 444.)

Intercase proportionality is not constitutionally compelled. (*Rangel, supra,* 62 Cal.4th at p. 1235.)

The fact that certain procedural protections are required for sentencing enhancements but not a death penalty verdict does not violate equal protection. (*People v. Manriquez* (2005) 37 Cal.4th 547, 590; *People v. Thomas* (2011) 51 Cal.4th 449, 507.)

Nor does California's use of the death penalty, and the purported violations of international law arising from its use, violate the state or federal Constitutions. (*People v. Lindberg* (2008) 45 Cal.4th 1, 53–54.)

### F. Incorrect Term on Firearm Enhancement

The Attorney General notes that the trial court mistakenly imposed one-third of the selected term on the firearm enhancements (§ 12022.5, subd. (a)) associated with the three murder counts, counts three through five, even though these counts were not subordinate terms. (Cf. § 1170.1, subd. (a); *People v. Felix* (2000) 22 Cal.4th 651 [enhancements to two or more consecutive indeterminate sentences are not subject to provision of Determinate Sentencing Act under which one-third of middle term is generally imposed for subordinate terms].) We have the authority to correct an unauthorized sentence at any time (*People v. Sanders* (2012) 55 Cal.4th 731, 743, fn. 13), and Choyce has not objected to the proposed correction.

## IV.   DISPOSITION

We order the abstract of judgment be amended to reflect a full term of four years for each of the firearm enhancements associated with counts three, four, and five (the murder counts). We otherwise affirm the judgment.

**EVANS, J.**

**We Concur:**

**GUERRERO, C. J.**
**CORRIGAN, J.**
**LIU, J.**
**KRUGER, J.**
**GROBAN, J.**
**JENKINS, J.**

*See next page for addresses and telephone numbers for counsel who argued in Supreme Court.*

**Name of Opinion**  People v. Choyce

---

**Procedural Posture** (see XX below)
**Original Appeal** XX
**Original Proceeding**
**Review Granted (published)**
**Review Granted (unpublished)**
**Rehearing Granted**

---

**Opinion No.** S169090
**Date Filed:** July 21, 2025

---

**Court:** Superior
**County:** San Joaquin
**Judge:** Linda Loftus

---

**Counsel:**

William Hassler, under appointment by the Supreme Court, for Defendant and Appellant.

Xavier Becerra and Rob Bonta, Attorneys General, Gerald A. Engler, Chief Assistant Attorney General, Michael P. Farrell, Assistant Attorney General, Sean M. McCoy and Jamie A. Scheidegger, Deputy Attorneys General, for Plaintiff and Respondent.

**Counsel who argued in Supreme Court (not intended for publication with opinion):**

William Hassler
Law Offices of William Hassler
P.O. Box 2082
McKinleyville, CA 95519
(707) 362-1845

Jamie A. Scheidegger
Deputy Attorney General
1300 I Street
Sacramento, CA 95814
(916) 210-7748